# Petroleum Exploration v. White et al.

(Decided January 16, 1931.)

·WM. L. WALLACE for appellant.

JOHN NOLAND and BURNAM & GREENLEAF for appellees.

OPINION OF THE COURT BY HOBSON, COMMISSIONER—
Reversing.

Mrs. C. L. Searcy owned, among other things, for her lifetime, 500 acres of pasture land in Madison county, which she held under the will of her husband, C. L. Searcy. On March 9, 1926, she granted to the Petroleum Exploration the right of way for a pipe line across the land in consideration of the sum of 25 cents a rod for

each pipe line and 50 cents per post for all telegraph and telephone lines. The grant contained this provision:

"The said grantor, her heirs and assigns, to fully use and enjoy the said premises except for the purposes hereinbefore sold, granted and conveyed to the said grantee its successors and assigns, who hereby agree, in addition to the consideration above mentioned, to pay any damages which may arise to crops and fences on said premises from the laying, relaying, constructing, repairing, maintaining, operating or removing of any such pipe line, or telegraph or telephone line; said damages, if not mutually agreed upon, to be ascertained and determined by three disinterested persons, one to be chosen by the said grantor, her heirs or assigns, one by the said grantee, its successors or assigns, and the third by the two so chosen; and the award of such three persons shall be final and conclusive."

Before the 1st of January, 1927, and when nothing had been done under the above grant, the executor of C. L. Searcy rented the 500 acres of pasture from January 1, 1927, to December 31, 1927, to H. G. Witt for grazing purposes. Witt afterwards took in James W. Wagers as a partner in the contract. He and Wagers put upon the pasture 77 head of steers to fatten for the market. After they had done this, the Petroleum Exploration, on May 16, 1927, made a written contract with Rich & Co. to dig the ditch for it across the land and put in the pipe. This contract contained among other things, these provisions; appellant being designated by the words "the company" and Rich & Co. by the words "the contractor:"

"The Company shall furnish and clear the right-of-way for such line and stake survey, which is to be the center of the ditch, the Company shall also furnish the pipe, couplings, valves and necessary fittings for same and at places and times hereinafter specified."

"The Contractor shall unload all the material for the construction of said pipe line from cars, consigned as aforesaid, and transport or haul the same to line of survey; all hauling, transporting and placement of material shall be confined as nearly as practical to the right of way consisting of a strip of

ground fifteen (15) feet wide, and seven and one-half (7½) feet wide on either side of said line of survey. All hauling or placement of material off of said strip of right-of-way shall be at the direction of the Company, and at such places as are indicated by the Company at the time. The Contractor shall build all roads and ways necessary to hauling and placing of said material.''

''The Contractor agrees to begin the construction of said line on or before the first day of June, 1927, and to complete the same on or before the first day of September, 1927, strikes, Acts of God, and other unavoidable delays excepted.''

On December 20, 1927, Witt and Wagers brought this suit, alleging that, while they were in possession of the land, under their rental contract, the Petroleum Exploration and Rich & Co. entered under the grant from Mrs. Searcy upon the land then in their possession and used by them for grazing purposes, and removed the fencing separating the farm of Mrs. Searcy from the lands of others and left the fencing down, willfully, knowingly, for the distance of 126 yards, and willfully, knowingly, and wrongfully failed and refused to replace the fencing, for a period of fifteen days; by reason of which 77 large cattle belonging to the plaintiffs got out of the inclosure and became mixed with other heifer cattle on the land of others at the time when they were beginning to be ready for the fall market, and by reason of this were injured and could not be put upon the market; that the cattle lost weight and were damaged in market value; the plaintiffs lost the use of the pasture and were put to great labor and trouble in collecting the cattle and removing them to other pastures, in all to their damage in the sum of $1,055.40, for which they prayed judgment.

The Petroleum Exploration filed answer denying the allegations of the petition in the first paragraph, and alleged in the second paragraph, in substance, that it had the right to do all that was done under its contract made before the plaintiff's contract was made. It also pleaded that Rich was an independent contractor, and that all things complained of were done by Rich & Co. and not by it, and alleged contributory negligence on the part of the plaintiffs. On th trial of the case before a jury there was a verdict for the defendant Rich & Co. and for the plaintiff for $500, against the Petroleum Exploration. The

court entered judgment on the verdict, and the latter company appeals.

It is chiefly insisted for appellant (1) that under the evidence a peremptory instruction should have been given in its favor at the conclusion of the evidence; (2) that instruction 5, given by the court, was erroneous.

1. H. G. Witt was sick at the trial. James W. Wagers testified to these facts: The persons putting down the pipe line entered on the land in August, 1927. At that time they had 77 steers on the 500 acres of pasture, which they had rented, weighing about 1,000 pounds each. He first learned that the fence was down on August 25, and went to see Oscar Winkle, the man in charge of the ditching. Winkle told him that it was his duty to put up the fence every night; for him not to worry about the cattle, that the fence would be put up. None of the cattle had then escaped. The fence was not put up. There were 126 yards of it taken away or so propped up that the cattle could go under it. He then went to see Earl Wallace, the chief engineer of the Petroleum Exploration and its boss in charge of the work on the ground. He showed Wallace the condition of the fence, and Wallace said: "I have a man paid for that purpose to look after these fences. Come on and go with me and I will have him do it." They then went together to Oscar Winkle, and Wallace told Winkle to go to this fence and put some posts in there and, fix it so that the cattle could not get through. Winkle said he would go. The fence was not fixed, and remained open for something like two weeks. During this two weeks 45 of the steers escaped from the pasture. At the end of the two weeks the fence was repaired and the cattle were put back in the pasture after a great deal of difficulty in finding them. The steers had been running with a lot of heifers that were in heat, and from their running them around they lost on an average about 50 pounds each. In addition to this, from their having lost flesh, their salable value in the market was less per pound than it would have been if they were fat. The itemized loss, as testified to by him, including loss of pasture and expenses, was in all $1,055.40.

The plaintiff proved by a number of other witnesses these facts: The Petroleum Exploration employed a number of men, who worked under Earl Wallace as its boss on the job, to go ahead of the ditching machine operated by Rich & Co. and clear off the right of way,

move the fences, and mark for Rich & Co., where to dig the ditch. This crew, so working for the Petroleum Exploration and paid by it, removed the fence in question and left it thus while Rich & Co. were going on with the ditching. There was clear evidence that the Petroleum Exploration, acting by its servants, under its boss, tore down the fence and left it down. The rights of appellee do not turn on the wording of the contract between the Petroleum Exploration and Rich & Co. The Petroleum Exploration is responsible to appellees if its servants tore down the fence and negligently brought about the injury to appellee.

It is also insisted for appellant that its rights under its contract were superior to the right of appellees under the contract made subsequently. But appellees were in possession of the land with their cattle, and the proof clearly shows that all parties understood that Mrs. Searcy, her heirs and assigns, had the right under the contract "to fully use and enjoy the premises except for the purposes" granted, and that the grantee was to pay any damages arising to crops and fences on the premises. In other words, the company was to exercise its rights with due regard to the rights of Mrs. Searcy, her heirs and assigns, to fully use and enjoy the premises. The case is not unlike that of tenants of different parts of a building. Each must exercise his rights with due regard to the rights of the other. In Bowman v. Williams, 231 Ky. 436, 21 S. W. (2d) 790, 791, the rule is thus stated: "It is an elementary principle of law that a man may do what he will with his own, but this right must be subordinated to another expressed in the familiar maxim, 'sic utere tuo ut alienum non laedas.' "

To the same effect, see Pittsburgh Railway v. Gilleland, 56 Pa. 445, 94 Am. Dec. 98; Rosenfield v. Arrol, 44 Minn. 395, 46 N. W. 768, 20 Am. St. Rep. 584.

There was here clearly some evidence that appellant negligently failed to put up the fence after it had notice of the danger and thus brought about the loss to appellees.

Wagers was Mrs. Searcy's son-in-law. They lived on adjoining farms. Though the contract with Witt was made in the name of the executor, it was carried out with her knowledge and acquiescence, and appellees had the rights reserved to her or her assigns. They were holding with her consent.

2. The instructions will be better understood if instruction V is read in connection with instructions I and II. The three instructions were as follows:

"I. If the jury believe from the evidence that during the time of the construction of the pipe line across the Searcy farm leased to plaintiff the defendants or either of them by their agents failed to exercise ordinary care or reasonable diligence in protecting openings made by them or either of them in the line fences made necessary in the reasonable and prudent prosecution of the work of construction and by reason of such failure, if any, the cattle of plaintiff escaped from the enclosure and mingled with other cattle and other cattle came into the enclosure and by reason of such wandering, mingling with other heifer cattle, they were rendered restless, nervous and excited and thereby the cattle lost in weight and were damaged in their market value, and that the plaintiff was put to any inconvenience or expense in collecting the escaped cattle and moving same to other pastures; and lost the use of the pasture land, the jury will find for the plaintiff against either one or both the defendants as the negligence, if any, of any one or both of them to the jury appears and unless they so believe or if they believe as set out in the II instruction the jury will find for the defendants either one or both of them.

"II. It was the duty of the plaintiffs to exercise ordinary care for the protection of their cattle with the knowledge of defendants' right to construct the pipe line in a prudent manner and if the jury believe from the evidence that the plaintiffs failed to exercise such care and by reason of such failure, if any, the plaintiffs themselves were negligent and such negligence, if any, on their part contributed to the injuries to the cattle, of which they complain, to such an extent, that except for it the cattle would not have been injured, and no expense incurred to collect same and no loss of pasturage happened the jury will find for the defendants although they may believe from the evidence that the defendant or either of them was negligent."

"V. If the jury find for the plaintiff they will award them such a sum in damages as they may believe from the evidence was the reasonable value

of the loss of weight, if anything, not to exceed ½ herd together the cattle which escaped not to exceed $25.00; the reasonable value of the loss of pasturage, if any, during the time the fence was down not to exceed $225.00; and the difference, if anything, in the fair market value of the 77 cattle before the fence was cut and the cattle escaped and the fair market value of said cattle after they had been collected and herded with the exercise of reasonable diligence taking into consideration the loss of weight, if anything, not to exceed 50 pounds per head and the loss, if anything in the salable value of the cattle by reason of the loss of weight, if anything, not to exseed ½ a cent per pound the whole of such loss, if anything not to exceed $805.40 the whole recovery, if anything, not to exceed $1,055.40 if any one or more or all of items of damage claimed and above set out inured to the plaintiffs as the direct or proximate result of the negligence of the defendants or either of them.''

The plaintiffs had rented the pasture for the cattle to graze upon. If the cattle had remained upon the pasture, they would have no ground of complaint. Their real measure of damages is the difference between the fair market value of the cattle when returned by them to the pasture or when by ordinary care they might have been so returned, and what the fair market value of the cattle would then have been if they had not escaped from the pasture. When they receive the fair market value of the cattle as they would have been if they had not escaped from the pasture, they receive all that they are entitled to. They were not entitled, therefore, in addition to this, to the loss of the pasture, and the words, ''and lost the use of the pasture land,'' in instruction I, should have been omitted, also the words, ''the reasonable value of the loss of the pasturage, if any, during the time the fence was down not to exceed $225.00,'' in instruction V. Following these words in instruction V, these words should be substituted for the words used in that instruction, ''and the difference, if any, between the fair market value of the seventy-seven cattle at the time they were returned to the pasture or could have been returned by the plaintiff by ordinary care and what the fair market value of the cattle would then have been had they not escaped from the pasture, taking into consideration the loss of weight, if

anything, not to exceed 50 pounds per head and the loss, if anything, in the salable value of the cattle by reason of the loss of weight, if anything, not to exceed one-half a cent per pound the whole of such loss, if anything, not to exceed $805.40.''

There was evidence tending to show that by ordinary care the plaintiffs could have minimized their loss. The rule applicable to the plaintiff in such cases is thus stated in Raleigh v. Clark, 114 Ky. 738, 71 S. W. 857, 859, 24 Ky. Law Rep. 1554: ''The law will not permit him to throw a loss resulting from a damage to himself upon another, arising from causes for which the latter may be responsible, which the party sustaining the damage might, by common prudence, have prevented.''

Again in Cincinnati, N. O. & T. P. Ry. Co. v. Gillispie, 130 Ky. 217, 113 S. W. 89, 90, the court thus stated the rule: ''If, however, plaintiff could, by the exercise of ordinary care, and at reasonable cost, have cleaned out the spring and removed the cause of its pollution, she could only recover up to the time when she could have so cleaned it out. It was her duty to minimize the damages if she could do so by ordinary care and at reasonable expense. She could not sit idly by and recover damages which she might have avoided by the exercise of ordinary care.''

Instruction D, asked by the defendants, went too far, and was properly refused, but the court should have given an instruction as indicated in the opinions above cited. No instruction on this point was given. Instruction II was simply an instruction that the plaintiff could not recover if guilty of contributory negligence. This instruction only went to the right of the plaintiff to recover. It did not go to the amount of recovery.

There was no substantial error in the admission or rejection of testimony. The real merits of the case were fairly presented to the jury by the testimony admitted; but, for the errors in the instruction indicated, a new trial must be granted.

The fact that the cattle were nervous and excited was competent to be considered by the jury with the other circumstances in determining the fair market value of the cattle when returned to the pasture; for cattle in this condition do not fatten well. This is not an action on the contract appellant made with Mrs. Searcy and lodged for record on January 25, 1927. It is an action for a tort and turns on what the parties did. The

18

settlement made by appellant with Mrs. Searcy on November 14, 1927, after this suit was brought, in no wise affects appellees; they were strangers to that settlement.

Judgment reversed, and cause remanded for a new trial.