## United States Bond & Mortgage Corporation v. Berry.

(Decided June 6, 1933.)

WILSON & ROBINSON for appellant.

WAUGH & HOWERTON, J. W. McKENZIE and HANNAH, VAN SANT & McKENZIE for appellees.

OPINION OF THE COURT BY JUDGE RICHARDSON—Reversing.

The Hans Watts Realty Company, as agent of the United States Bond & Mortgage Company of Kentucky, and Sam Berry, a resident of Ashland, Ky., entered into a contract, subject to acceptance by the United States Bond & Mortgage Corporation, reciting that the United States Bond & Mortgage Corporation was the owner of certain properties located at No. 2625 Holt street, 2428 Adams street, 5272 Winchester avenue, and 1908 Carter avenue, Ashland, Ky., and that Berry was the owner of certain property located at the southwest corner of Twenty-Third street and Carter avenue, Ashland, Ky., and that they would exchange these properties for the consideration recited in the instrument, and execute and deliver deeds with covenant of general warranty, according to its terms. At that time Berry's property was incumbered by a lien of the Louisville Title Company, and the property of the United States Bond & Mortgage Company, by certain liens. The difference in their equities was $2,620 in favor of the United States Bond & Mortgage Corporation, which Berry agreed to pay in cash on the consummation of the deal, each party assuming the existing liens on the properties. Berry thereafter agreed to lease a certain portion of the property of the United States Bond & Mortgage Corporation for a definite period of time for a fixed rental and to execute a mortgage to secure it. At the time the contract was signed by Berry and wife, and the Hans Watts Realty Company, certain insurance policies were in existence, insuring the property of each against loss by fire. They were not considered by the parties at the time of the making of the contract, and no mention of them is made therein. A deed was prepared by an attorney, residing at Ashland, Ky., and forwarded to the United States Bond & Mortgage Corporation, Louisville, Ky., for execution. It was later signed and acknowledged by John J. Davis, president, and J. S. Wigginton, assistant secretary, of the United States Bond & Mortgage Corporation. Wigginton, before leaving Louisville to go to Ashland to complete the deal between the corporation and the Berrys, went to the Southern Trust Company which held a lien on the property the

United States Bond & Mortgage Corporation was conveying to the Berrys, and obtained a list of the policies, together with the numbers, the amounts, the dates, the stipulated premiums, and the dates of their expirations. Wigginton, with this statement of the insurance, and the deed which was to be delivered to the Berrys, went to Ashland, Ky., to meet with the Berrys, deliver the deed, accept their deed, lease, and mortgage, given by the Berrys to secure the rental per the terms of the leae. The deed, the lease, and the mortgage do not state or indicate that the insurance policies on the respective property were in any way considered in the transaction.

Wiggington, the Berrys, and the attorneys representing them, assembled at the office of Wilson and Robinson on the 15th day of December, 1930, for the purpose of delivering and accepting the papers evidencing these transactions. At the suggestion of the attorney of the Berrys, a slight change was made by the parties in the mortgage. A certain portion of the property was conveyed directly to Mrs. Ada Berry, including a cottage and a garage with an apartment above, located in the rear of a brick residence fronting on Winchester avenue. At that time the Southern Trust Company of Louisville had the possession of the insurance policies on the brick building, on Winchester avenue, of the face value of $8,000, evidenced by two policies, with a loss payable clause. There was no policy of insurance in existence covering the cottage and garage with the apartment above. On the 31st day of January, 1931, the cottage and the apartment over the garage were destroyed by fire, and the garage damaged thereby. Mrs. Berry filed this action against the United States Bond and Mortgage Corporation in which she charged "that at the time said deed [the deed from the U. S. Bond & Mortgage Corporation to her] was executed and delivered by the defendant to her, and as a part of the consideration for the acceptance of said deed, and for the purchase of said property covered by said deed, the defendant then stated and represented to her that it held two valid fire insurance policies protecting it against loss from fire which might result to the buildings upon said lot in the following proportions: that it had a $5,000 fire insurance policy protecting it against loss from the burning of the dwelling on the front part

of said lot facing Winchester Avenue, and that it had a $3,000 fire insurance policy protecting it against loss by fire on the dwelling house and the accommodation garage and apartment in the rear of said lot; that it represented the said policies were in existence that they were in solvent fire insurance companies and were payable to it, and that it then had protection against loss by fire as above alleged; that it represented the said policies were held by the Southern Trust Company in Louisville, Ky. Plaintiff further says that the defendant, as a part of the consideration mentioned in said deed and as an inducement to her to accept said deed, agreed and promised to immediately thereafter procure an endorsement by the fire insurance company or companies with whom the said insurance was held, transfer said policies to this plaintiff as beneficiary in said insurance policies. Plaintiff says that she relied upon the statements and representations of the defendant heretofore alleged to have been made as being true, that she had no opportunity to see said policies and that she has never seen said policies; that she relied upon the agreement of the defendant to have transferred said policies of insurance from its name to the plaintiff * * * and she did not take out any other insurance to protect her against loss by fire to the above mentioned buildings." An appropriate and adequate defense was interposed by answer. A trial before a jury resulted in a verdict in her favor of $2,200, interest and costs.

The husband and wife were introduced and permitted to testify about the transaction with Wiggington, occurring when they were both present and had equal opportunity to know the same facts. The competency of the testimony of the husband, in the circumstances, is a question to be determined. The United States Bond & Mortgage Corporation requested a peremptory instruction at the close of the evidence in behalf of the plaintiff and also at the close of all the evidence. The motion was overruled. The propriety of refusing this instruction is the vital decisive question.

The title bond executed by the parties, the manner of the preparation of the deeds, in accordance therewith, their delivery and acceptance, with the lease and mortgage, and the conversations of the parties concerning the insurance and the having the insurance companies to consent to the transfer thereof, show very

clearly that the agreement respecting the transfer of the policies by the parties was no part of the consideration for the exchange of the land evidenced by the deeds, and furnished no motive or inducement for the delivery and acceptance of the deeds in accordance with the provisions of the title bond. Mrs. Berry was present during the conversation between Wigginton and her husband, and heard the statements of Wigginton concerning the insurance policies. She states in her testimony that "the manager (Wiggington) stated that he would go back home, and that he would send some of the insurance policies back. He said some of the insurance policies were in Louisville and some in Ashland, and that he would see to having it all transferred; some of it was to change that day." "Mr. Nickells, called up the insurance people, * * * I did not pay close attention but he (Mr. Berry) was attending to that part of it himself * * * Mr. Berry and them talked insurance there in my presence. * * *" Omitting the questions of Mr. Berry, we adopt his answers: "Why we was to exchange insurance, and he said we could swap, and that we could save something, I don't know how much we could save on the insurance, and the insurance people would not have to cancel their policies which would save us money, so we both agreed to transfer the insurance. I was to transfer all of my insurance to them, and they were to transfer all of their insurance to me. We agreed upon that plan." "He had a yellow piece of paper, and he stated there was so much due for unearned premiums on the $5,000.00 policy * * * the policy for that much on the brick in front, and there was so much unearned on the premium on the $3,000 on the cottage in the rear of the garage." "He told me they were in the hands of the Southern Trust Company in Louisville." "He stated he would go back and see the Southern Trust Company, and he would go to the Southern Trust Company and have all the policies transferred to me or to my wife rather, and would send us a statement of all of the companies in which any of the policies were written; some were with Ashland firms and some were in Louisville, and if I wished to exchange my policies to the Ashland people, I might do so." "Mr. Wiggington made out a written statement showing the different policies held by the U. S. Bond & Mortgage Corporation, and the values of the policies held by him." "I was given a copy of that statement that day."

McKenzie, a witness for Mrs. Berry, stated:

"Mr. Wiggington or someone had figured on this piece of paper, this yellow piece of paper that has been introduced in evidence, the insurance that was on the U. S. Bond & Mortgage Corporation property and also the insurance on the Berry property and the difference between the values of the policies. He gave that paper or a copy of it, to Mr. Berry and told him that that represented all of the insurance on these properties, and they went into a discussion there about the Winchester Avenue property specifically as I remember it. And in the conversation it was suggested that there were two houses on that property. Well it was stated, I will say by Mr. Wiggington that there were two pieces of property on there and that the insurance as represented on that statement there covered the property on Winchester Avenue which was being conveyed, Mr. Wiggington said, to Mr. Berry, and that as the Southern Trust Company held first mortgage on the Winchester Avenue property that those policies were held by the Southern Trust Company at Louisville, and when he got back over to Louisville he would see that they were transfered to Mr. Berry and would send him a statement showing the names of the companies and the amounts of each policy."

The paper which the witnesses describe as delivered by Wiggington to Berry, in so far as it relates to the property deeded by the United States Bond & Mortgage Corporation, is as follows:

"Mortgages

| | | |
|---|---|---:|
| 5272 Wis.— | "5000 F 12-12-32 | 17.78 |
| | 3000 FM 3-33 | 11.83 |
| | 1650 F Aug 7632 | 4.29 |
| | 6000 F RR 11-23-31 | 10.59 |
| | Total | 44.49" |

It is very clear from this evidence that the deal between Wiggington and the Berrys in reference to the insurance policies was a distinct and separate transaction from that of the exchange of the land and the delivery and the acceptance of the deeds in accordance with the title bond. The two transactions are distinct, though coincident in time. It is perfectly competent for par-

ties to embody in the writing between them the agreements appertaining to the sale of property, and simultaneously enter into a distinct transaction between themselves, concerning a different, or the same, subject-matter, though merely coincident in time, but which was not intended by them to be covered by the writing. New York Canners v. Rucker, 238 Ky. 204, 37 S. W. (2d) 31.

The evidence shows that they and Wiggington engaged in two distinct, independent, separate transactions; i. e., (1) the delivery and acceptance of the deeds in accordance with the title bond, (2) the agreement to swap and in swapping insurance policies, existing on the property covered by the deeds. And as an incident to the latter, they agreed to assist each other in the procurement of the consent of the insurance companies to the transferring of the policies.

It is fair to say that the deeds were prepared, signed, acknowledged, delivered, and accepted by them in compliance with the terms of the title bond, without any consideration or regard whether the property was insured in any amount, or even insurable.

The parties agreed and exchanged policies, not as a part of the sale and conveyance of the property, nor as an inducement of the delivery and acceptance of the deeds, but solely, as Mr. Berry testifies, "to save us money," by continuing them in force at short rates, and did so without considering whether the $5,000 policy was on the brick residence or the $3,000 was on the cottage, or whether the two policies covered one or both properties, or whether Wiggington returned to Louisville or remained in Ashland. The statements of Wiggington concerning his return to Louisville, and, after his arrival, he would send to the Berrys a statement of the insurance, were merely the expression of his willingness to render them an accommodation. It is very plain that the Berrys did not regard his statements as binding and enforceable as against the United States Bond & Mortgage Corporation, in the event Wiggington failed to return to Louisville or send them the statement as he agreed. At the time and place the Berrys assert that Wigginton made this promise to them, the $5,000 and the $3,000 policy were in insurance companies, represented by C. E. Montague who at that time resided at Ashland, and, as a part of the res gestæ, Montague was called by telephone from the office of Wilson and Robin-

son, and, as agent of the company issuing the two policies, consented to transferring them to the Berrys, and did so. With the policies thus transferred by Montague, there was no necessity for the claimed agreement of Wiggington and the Berrys, and for the latter to rely thereon, even though made as claimed. As further evidence tending to show that the statements of Wigginton were merely regarded by him and the Berrys as an expression of his willingness to accommodate them, at the time they claim he made the statements there was a clause in the mortgage, at that time delivered by the Berrys to him, requiring them to carry insurance on the property deeded to them by the United States Bond & Mortgage Corporation, to an amount not less than $7,280, as an indemnity to the Southern Trust Company for $5,280, and to the United States Bond & Mortgage Company for $3,000. This obligation of the mortgage was fulfilled in their behalf by Montague consenting to and transferring the two policies, aggregating $8,000.

The evidence does not show that it was the intention of the parties that the delivery and acceptance of the deeds, and the deal as to the exchanging of the insurance policies, were an inducement or a consideration, the one for the other, or that either of these transactions was conditioned that Wiggington, on his return to Louisville, would have either the $3,000 or the $5,000 policy transferred, and that he would send a statement thereof to the Berrys. T. M. Gilmore & Co. v. W. B. Samuels & Co., 135 Ky. 706, 123 S. W. 271, 21 Ann. Cas. 611; N. Y. Canners v. Rucker, supra; Koppers Co. v. Asher Coal Mining Co., 226 Ky. 492, 11 S. W. (2d) 114; Wigmore on Evidence, Vol. 4, sec. 2430, page 3425.

As an example, as stated by Mr. Wigmore:

"A banker at an interview with a promoter, who comes from a distant city and compresses all their affairs into a short interview, may within the same half hour sign articles of incorporation, authorize an overdraft, assign a mortgage, and join in a committee's report to stockholders, or a purchaser of land negotiating with a broker, may at the same sitting accept a deed of grant of one piece of land and appoint the broker his agent to sell another piece. In such instances the transactions are so clearly distinct, that each one if integrated, will certainly be embodied in a writing wholly distinct

from the others and regardless of whether the others are reduced to writing at all.''

The evidence herein brings this case within this category.

The fact that Wiggington and the Berrys themselves regarded the swapping of the insurance policies as a distinct and separate transaction from the sale of the land is manifested by the testimony of Mr. Berry to the effect the ''subject of insurance on the properties was not discussed until the time the deal was closed.'' It is a fair and just conclusion, on the evidence, that the delivery and acceptance of the deeds were regarded by the parties as a distinct, independent, and separate transaction from that of swapping of the policies, and that their conversation concerning the procuring of the consent of the companies for their transfer and the physically transferring them was, at the time, considered by the parties as an expression of a willingness to accommodate each other in this respect.

But accepting the theory of the Berrys that the statements and promise of Wiggington were made by him while they were engaged in agreeing on the swapping and transferring of the policies, and that the same were supported by a good or valuable consideration, binding and enforceable, according to the present contention of the Berrys, the failure of Wiggington to comply with his promise within a reasonable time thereafter was a positive knowledge of, or notice to, the Berrys of the breach or violation of the promise, thus, bringing this case within the rule that, where a contract does not specifically state the time within which the contractor shall comply therewith, the law implies or allows to him, for that purpose, a reasonable time according to the circumstances. E. H. Taylor, Jr., & Sons. v. Louisville Warehouse Co., 72 S. W. 20, 24 Ky. Law Rep. 1656; Asher v. Asher, 141 Ky. 268, 132 S. W. 415.

The destruction of the buildings by fire occurred January 31, 1931, or 47 days after it is claimed the contract was made. If the contract was made and violated as claimed by the Berrys, the breach thereof happened long before the expiration of the 47 days, and the Berrys had knowledge thereof by reason of his failure to send them a statement as he agreed, long before the happening of the fire. If any damages occurred as a result of Wiggington's breach of the contract, the same

were incurred, and, if any cause of action accrued on account thereof, it accrued long before the burning of the property, and the loss sustained by reason thereof was not and cannot be considered as an element of such damages.

It is elementary that for a breach of a contract only two kinds of damages may be recovered: (a) General and (b) special. Hadley v. Baxendale, 9 Exch. 341; Moss Jellico Co. v. American Ry. Express Co., 198 Ky. 202, 248 S. W. 508.

In Hadley v. Baxendale, the two kinds of damages recoverable for a breach of contract are defined: (1) general damages, recoverable for a breach of contract, are such as may fairly and reasonably be considered as arising naturally—that is according to the usual course of things—from the breach of the contract itself or such as may reasonably be supposed to have been in the contemplation of the parties at the time they made the contract as the probable result of the breach of it; and (2) special are such as arise where there are special circumstances attending the making of the contract and its observance would take it out of the natural and usual course of things. The parties when entering into a contract are supposed to know this, and to consent that the exitsing law fixing the criterion of damages for a breach becomes a part of the contract as if it was expressly a part of it. In order to recover special damages the party sought to be charged must have had notice of such circumstances at the time the contract is made, and in such a way that he must know that the person with whom he is contracting reasonably believes that he is accepting the contract with the special condition. It is not required that he must have actual knowledge or information in detail as to just what loss will result. It is sufficient if the circumstances are known to the parties or are of such character that they may be fairly supposed to have been in contemplation in the making of the contract. Pulaski Stave Co. v. Miller's Creek Lumber Co., 138 Ky. 372, 128 S. W. 96. When these controlling principles are applied to the facts presented by the evidence they deprive Mrs. Berry of the right to recover, herein, the value of the buildings destroyed by fire. The fact the $3,000 policy did not cover the cottage and garage with an apartment above does not distinguish the case from one where there is a failure to

have transferred a policy which actually exists and which the vendor agrees to have transferred in the name of the vendee. In the latter case the vendee is not protected by the policy until it is in fact transferred, or the transfer is consented to by the insurance company. The vendee is without the protection the same in the first as in the latter instance. It should be noted that, where property is protected by a policy of insurance at the time it is conveyed by a vendor to a vendee, without a transfer of the policy, with the consent of the company, the deed of the vendee is such a change in the title as will deprive both the vendor and vendee of all right of recovery on the policy. French v. Delaware Ins. Co., 167 Ky. 176, 180 S. W. 85.

In Dodd v. Jones, 137 Mass. 322, the vendor agreed to assign to the vendee a policy of insurance which he held on the property conveyed. He did not assign it, although requested several times by the vendee, but promised to do so, and gave some excuse for not having done it. The vendee relying upon the promise of the vendor to effect the assignment procured no insurance on it. About three weeks after the last demand of the vendee for the assignment, the house was injured by fire.

The court said:

"The agreement was not a contract of insurance, but of sale; and the measure of damages for the breach of it was the value of the thing sold. A sum that would procure a similar policy, and thus place the plaintiff in the position she would have been in had there been no breach of the contract, would indemnify her, and she cannot elect to go without insurance, and hold the defendant as insurer. Damages resulting from the burning of the building are not the direct and natural consequence of the breach of the defendant's contract, and could not have been contemplated by the parties as included in it. The natural consequence of the failure of the defendant to perform his contract would be that the plaintiff would procure another policy of insurance, and she cannot charge the defendant with the consequences of her neglect to do that. Loker v. Damon, 17 Pick. 284. Miller v. Mariner's Church, 7 Greenl. [7 Me.] 51 [20 Am. Dec. 341].

Grindle v. Eastern Express Co., 67 Me. 317 [24 Am. Rep. 31]. Hoadley v. Northern Transportation Co., 115 Mass. 304 [15 Am. Rep. 106]."

In Elfenbein v. Abbondanza, 64 Misc. 176, 118 N. Y. S. 1073, the vendor failed to have an insurance policy changed to the vendee's name in compliance with his contract. It was held that the vendor did not become, by reason of his contract, the insurer of the property, and that he was not liable for the amount of the policy on the destruction of the property by fire. The pronouncement in these cases is in harmony with the general rule enunciated in Hadley-Baxendale.

An agreement of a vendor to have a policy so transferred is not equivalent to an agreement to insure or to look after and cause to be insured, or pay for insurance on the property for the vendee. The duty and obligation to have his own property insured and to keep it insured rest entirely upon the vendee, and, if he relies upon the vendor's promise merely to see that a policy of insurance is placed in his name, he may not hold such vendor liable to him as the insurer, though the policy does not in fact cover the property conveyed, for such liability is not regarded by the law as being within the contemplation of the parties at the time of entering into the agreement to have the policy transferred in the name of the vendee.

Equally as sound reason for refusing to hold the United States Bond & Mortgage Corporation liable to Mrs. Berry as an insurer is, after she discovered, at the expiration of a reasonable time, Wiggington's failure to carry out his promise, she failed to use reasonable, or any, efforts, or to exercise any degree of diligence to protect herself against the breach of the contract. Under the doctrine of minimizing damages, it was her imperative duty, after she had knowledge of the breach of the contract, to take such steps as an ordinary prudent person under similar circumstances ordinarily takes to protect himself from such damages as might arise from the failure of the contractor to comply with his contract, or within a reasonable time thereafter. Fremd v. Gividen, 233 Ky. 38, 24 S. W. (2d) 915. The rule is that a party to a contract, upon finding that the other party to it has breached it, must use reasonable exertion and reasonable expense and exercise reason-

able diligence to minimize the loss resulting from its breach. Western Union Teleg. Co. v. Witt, 110 S. W. 889, 33 Ky. Law Rep. 685. He cannot stand idly by and permit the loss to accrue or increase, then hold him who breached it liable for the loss which he might have prevented by the use of reasonable efforts, expense, and diligence to prevent, or arrest, the loss. Wood-Mosaic Co. v. Britt, 150 Ky. 357, 150 S. W. 355; Byars v. Hammock, 205 Ky. 684, 266 S. W. 365; L. & N. R. R. Co. v. Sandlin, 209 Ky. 442, 272 S. W. 912; Petroleum Exploration v. White, 237 Ky. 10, 34 S. W. (2d) 738; C. & O. Ry. Co. v. Clifton, 237 Ky. 519, 35 S. W. (2d) 884; Watson v. C. & O. R. R. Co., 238 Ky. 31, 36 S. W. (2d) 641. The cottage was vacant on December 15, 1930, and continued vacant until January 31, 1931. This being true, even if Wiggington had carried out his contract according to the provisions thereof, and if the $3,000 policy actually had been transferred in the name of Mrs. Berry, assuming that the policy contained the usual clause providing for a forfeiture in the event the property was or becomes vacant, unoccupied, or uninhabited for ten consecutive days, she could not have sustained a recovery against the insurance company. Thomas v. Hartford Fire Ins. Co., 53 S. W. 297, 21 Ky. Law Rep. 914; Farmers' Mutual Ins. Co. v. Smith, 158 Ky. 459, 165 S. W. 675, L. R. A. 1915B, 844; Burner's Adm'r v. German Ins. Co., 103 Ky. 370, 45 S. W. 109, 20 Ky. Law Rep. 71. The fact the cottage was unoccupied is a sound reason for denying a recovery, and shows the justice of applying herein the rule as it is stated in Dodd v. Jones, and Elfenbein v. Abbondanza, supra.

It is apparent that it is our view that the court should have directed a verdict for the United States Bond & Mortgage Corporation. The objections to the testimony of Mr. Berry were improperly overruled. Section 606, Civil Code of Practice; Butler's Assignee v. Butler, 227 Ky. 67, 11 S. W. (2d) 978; Rose v. Monarch, 150 Ky. 129, 150 S. W. 56, 42 L. R. A. (N. S.) 660, 667; Prestonsburg Superior Oil Gas Co. v. Wheeler, 215 Ky. 85, 284 S. W. 409.

Mrs. Berry was present at the time of the happening of the transaction about which her husband testified, and heard the statements detailed on the witness stand by him. The rule is that both the husband and wife may testify, when either is acting as agent of the

other, as to facts that come to the knowledge of one in the absence of the other, but not as to facts that occur when the other is present. The only difference between Mrs. Berry's testimony and that of her husband is in the detailing of the conversation between him and Wiggington; his was more elaborate. Clearly it was improper to permit both to testify.

For the reasons indicated the judgment is reversed, with directions to dismiss the petition, and for proceedings consistent with this opinion.