## Damron v. Stewart & Weir.

(Decided March 13, 1934.)

CARY, MILLER & KIRK for appellant.
SANDIDGE & SANDIDGE for appellees.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—
Reversing.

Stewart & Weir, partners, sued W. W. Damron on an account based upon an implied contract to pay for labor performed and material furnished at his special instance and request in the drilling of an oil well. It is alleged that the defendant was indebted to the plaintiffs in the sum of $2,628.10, credited by $783.34, and judgment was prayed for the balance of $1,844.76 with interest. It is not alleged that the sum charged and stated was the reasonable value of the labor and material. The answer was a traverse. The judgment was for one-

half of the sum asked, $922.38, but upon what basis it was arrived at is not disclosed.

We pass for the moment the evidence of the plaintiffs to state the situation as established by the defendant and not shown to have been otherwise. Carl Tremor had acquired oil leases on about 14,000 acres in Meade county which was regarded as "wildcat" territory. Damron had loaned him $300 for this purpose and the plan was that Tremor should sell blocks or interests in those leases and sink a test well. Damron, who was a promoter, agreed to recommend the purchase of those interests to his friends as a prospective venture, reasonably hopeful of profit, and in connection with others he bought a share or two. The arrangement was that the proceeds from the sales were to be used in paying for the test well and in case of successful exploration Damron was to have some commission or perhaps a half interest in the well. His prospective reward or remuneration is not clearly shown. The well was drilled by the plaintiffs but proved to be dry, and this suit was to recover of Damron the balance which he had not paid the plaintiffs.

Stewart testified that he had declined to drill the well for Tremor and he had sent him to Damron. He told Damron this and Damron told him if he could not do it for Tremor he could do it for him, and told him to go ahead and drill the well. They discussed and agreed upon the size of the hole. At the time Stewart had the price for the work on a memorandum of contract which he handed to Damron. He was to charge $2.50 a foot for drilling and the customary price of $25 a day when the work was shut down, and the well was being bailed out. To the extent of one-eighth of the total cost, the plaintiffs were to receive acreage in certain portions of the lease at the rate of 50 cents an acre. The total cost proved to be $2,628.10, and Tremor had turned over to the plaintiffs different checks received from the sale of the leases to the amount of $783.34. When Stewart presented the bill for the balance to Damron, he told Stewart he would get it in a few days as he was very busy with some other trouble he was having. No objection was raised as to the amount. Stewart admitted on the trial that he knew of the arrangement whereby his pay was to come from the sale of the leases, and he seems to have known that Tremor had collected more than enough to pay him but had not done so. When he went to Dam-

ron for the balance, Damron expressed surprise that Tremor had not paid the account, and suggested that Stewart sue Tremor to get the money. This was done, and in their verified petition against Tremor the plaintiffs charged, as they did in this suit against Damron, that they had done the work for Tremor at his special instance and request and he had promised and agreed to pay them for these same services. That suit seems to have been dismissed. On cross-examination Stewart testified that he was told by both Damron and Tremor that the money for the well was to be raised by the sale of the leases and that was what he had agreed to look to for his money. The other partner, and plaintiff, Weir, testified that after the work was done Damron advised them to sue Tremor and said that if he did not pay he (Damron) would do so. The plaintiffs received four leases as part of their compensation, as agreed upon.

In defense, Damron denied making any contract with the plaintiffs, explaining that he owned six rigs and was himself in the business of drilling oil wells and that he could have done this for $1 a foot. His version is that Stewart asked him if he was going to have an interest in the acreage and he told him that he was. At another time Stewart asked him to sign a contract to drill the well, but he declined to do it. He had nothing to do with the venture otherwise than as we have related. The only thing he told the plaintiffs was to say to Stewart that he would see that this money was raised before he drilled the well, and that as a matter of fact $1,000 more was taken in by Tremor than was necessary to pay for it. After the well was drilled and the $783.28 was paid, there was a conversation between Damron, Tremor, and Stewart in which Tremor claimed that he had had considerable expense and some of the leases had not been paid for. According to Damron's evidence, he told the others to collect the money as it belonged to them, and, in response to a suggestion of shooting the well, he told them to do as they pleased, but so far as he was concerned they should not exceed $235 more. He testified that Stewart knew he was not going to pay for the well personally and only was to help Tremor sell sufficient acreage, which he had done. He denied categorically any promise to pay the several items listed in the account filed with the petition and in evidence, and denied having ever stated that he would pay the balance if Tremor did not.

This rather full statement of the evidence, we think, shows that it was sufficient to take the case to the jury upon the allegations of the petition that Damron had directed the work to be done and had promised to pay the sums set out in the account filed.

The plaintiffs in their petition relied strictly upon an implied contract. The distinction between an express and an implied contract is thus succinctly drawn in 6 R. C. L. 587:

"When there is an actual promise a contract is said to be express; when there is no actual promise a contract is said to be implied."

The plaintiffs' proof established an express contract. As stated in Bates v. Starkey, 212 Ky. 347, 279 S. W. 348, if work is done under an express contract, the rights of the parties are measured by the contract and neither can rely upon an implied contract. There was a variance in rather than a failure of proof; but as we apprehend that the situation will be cleared up by amendments upon a return of the case, it does not seem necessary to consider whether it was fatal, requiring a peremptory instruction, or was such a variance as is contemplated by sections 129 and 130, Civil Code of Practice, which permit amendment of the pleading to conform to the proof. The petition was not amended. Cf., Muldoon v. Meriwether, 79 S. W. 1183, 25 Ky. Law Rep. 2085.

The appellant's point is well taken that the instruction given by the court which only authorized the jury to find for the plaintiffs under an express contract was error, although the evidence tended to establish such. It is a familiar rule that the instructions must rest upon the pleading supported by evidence. However, the appellant is not in position to complain of that instruction for he offered one the same in substance and submitted none on the theory of an implied contract. Bullock v. Young, 252 Ky. 640, — S. W. (2d) — . This was and must be deemed a waiver.

The second instruction directed that if the jury found for the plaintiffs, they should award them such sum as would reasonably compensate them for the labor and material not exceeding the amount claimed in the petition. This was error, for the plaintiffs claimed the sum stated in the account sued on and they did not seek

to recover upon a quantum meruit. As the first instruction was without pleading, the second instruction is without either pleading or proof.

The appellant insists he was entitled to the instruction offered to the effect that if the jury believed plaintiffs had agreed to look to the fund raised from the sale of the leases by Tremor for their compensation, they should find for the defendant. The evidence of the defendant brought the case within those authorities in which it has been held that no contract can be implied under which a personal indebtedness will be created where the parties agree that compensation shall come from commissions or other special funds to be realized. See Fox v. Buckingham, Trustee, 228 Ky. 176, 14 S. W. (2d) 421; Hibbs-Kiefer Hat Company v. Schneiderham, 236 Ky. 470, 33 S. W. (2d) 304. We are of opinion that the defendant was entitled to have this defense submitted to the jury for its consideration. A defendant may show under a general denial that another and different agreement was actually made by the plaintiff. To set it up specially in defense would offend the rule against argumentative pleading. 13 C. J. 735; 49 C. J. 91; Cumberland Tel. & Teleg. Co. v. Cartwright Creek Tel. Co., 128 Ky. 400, 108 S. W. 875, 32 Ky. Law Rep. 1357; West v. Butler's Ex'r, 248 Ky. 404, 58 S. W. (2d) 662; Mayfield v. Cupp, 251 Ky. 329, 64 S. W. (2d) 884; Cf. Schilling v. Heringer, 252 Ky. 624, — S. W. (2d) —.

For the reasons given, the judgment is reversed.