## Fruit Growers Express Co. v. Citizens Ice & Fuel Co.

(Decided Nov. 30, 1937.)

DYSARD & TINSLEY, J. B. JOHNSON, and J. J. TYE for appellant.

TYE, SILER, GILLIS & SILER for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—Reversing.

The appellant, Fruit Growers Express Company, leases refrigerator cars to railroads for the transportation of perishable goods. It provides icing facilities along the lines and keeps the cars supplied with ice when in use. On November 21, 1928, a contract was made between the appellant and the appellee, Citizens Ice & Fuel Company, whereby the latter company agreed to erect an ice plant on the L. & N. Railroad at Corbin with a daily manufacturing capacity of not less than 50 and a storage capacity of not less than 3,000 tons. It was further agreed that should the express company require ice in excess of that capacity the Ice & Fuel Company would enlarge its facilities to meet such increased requirements. Section 1 of article 2 of the contract is in part as follows:

"Contractor undertakes and agrees hereunder to supply, sell and deliver, or cause to be supplied, sold and delivered to the Car Line, as the Car Line may from time to time direct, and the Car Line undertakes to buy and pay for the Car Line's entire requirements of ice for icing and/or re-icing cars placed at Contractor's said plant near Corbin, Kentucky, as hereinafter provided, for the purposes hereof, beginning January 1, 1929."

Stipulating that the emergent nature of the services required always demanded the utmost good faith, the ice company undertook to report promptly, "any impending condition which may tend to hinder, delay, or prevent the due and full performance of this agreement, but no such report shall in any wise operate to relieve Contractor of any obligation under this contract or of responsibility for any breach hereof or failure to perform his full undertaking herein."

The ice company agreed to ice the cars according to the express company's directions and became bound for any damages suffered on account of a failure to furnish

ice as required and demanded by it. Other parts of the contract do not seem material to the case in hand.

By a supplemental written contract the price being paid by the express company for the ice and service at the time involved in this case was $4.50 a ton.

As early as April 11th, the express company, by letter, had advised the ice company that it was estimated there would be about 150 cars of peaches coming from Tennessee that would need icing at Corbin during the 1934 season. This would require 1,200 tons of ice. The estimate was repeated on May 21st, with the suggestion that the ice company should begin storing ice, and the company responded that it might have to store 600 tons but would not need to start doing so until about July 1st. On July 12th, the express company advised that its estimate was that there would be 155 cars of peaches, but that the railroad company's estimate was 200 cars, and that these would start moving about July 28th. Again it was suggested that 1,200 tons of ice would be needed. On July 24th the express company's general agent, M. L. King, repeated the estimate and inquired about how much ice the company had on hand. On that day the president of the ice company, T. E. Mahan, wrote that it had 700 or 800 tons, and on the 26th he wrote that arrangements had been made with a plant at Middlesboro to supply whatever ice it might be short. They had had some mechanical trouble in their factory beyond its control. Since the contractual relations had begun, it had been the custom of the express company to give estimates of requirements for the fruit shipping season.

It is not clear how many cars had been iced by the morning of August 4th. According to Mahan, King called over long distance telephone and advised the peaches had grown twice the size expected and that the express company would need twice as much ice as he had originally anticipated. He insisted that Mahan have a representative available with whom he (King) could keep in constant touch. During that day, according to Mahan, they had 8 or 10 long distance telephone conversations. King stated there would be 80 cars to be iced during the next 24 hours, which would take 640 tons of ice. When Mahan informed him that his company did not have that much on hand and could not produce it, King directed him to buy the ice and offered to help him get some from Knoxville, and warned him that

his company would be held liable for any loss that might be sustained by its failure to comply with its contract.

King's version is that the express company's representative at Corbin had advised him on the morning of August 4th that the ice company had on hand only 80 tons of ice. He estimated that 700 or 800 tons would be necessary for the remainder of the season, and advised Mahan that the business would be getting heavy on the next day and continue so for two or three days. Mahan said that he had not understood the situation, but would look into it. During the day he advised King that he had bought ice at Middlesboro, Cincinnati, and Norton, Va. He accepted King's offer to buy some ice in Knoxville, and King did so for $3 a ton, and it was shipped to Corbin. King testified that at no time did he undertake to tell Mahan what he should do or not do, nor did he direct or order Mahan to purchase any ice anywhere, nor advise him that there would be 80 cars a day to be iced. During this season, which extended from July 27th to about August 13th, 126 cars were iced at Corbin, and the express company had received and paid for 1,006.20 tons. King admitted that after he told Mahan 800 or 900 tons would be needed, the company took only 340.65 tons. The cause of the error in the estimates was extraordinary shipments of the crop by truck, there having previously been but little such competition.

After the telephone conversations of August 4th, the ice company ran its plant at its full capacity of 53½ tons a day, and purchased 429.15 tons of ice at a cost of $2,836.54, or $5.89 a ton. This included transportation and handling charges.

The ice company sued the express company to recover this expenditure and obtained a judgment for the full amount. The express company appeals and insists that the suit is based upon the written contract of the parties and that it was entitled to a directed verdict because the ice company was simply preparing itself to meet its obligations under the contract. However, it is argued that, if it be held that its motion for a peremptory instruction was properly overruled, then that the judgment should be reversed because of the erroneous instructions.

Counsel for the appellee maintain that the action is based upon an independent, oral contract and that its right to recover the judgment was and is based upon an implied contract to pay for the ice which it was special-

ly directed to procure and which the express company refused to accept.

The appellee set up the written contract in its petition as the basis of its cause of action. At the conclusion of the evidence it filed an amended petition, as it stated, to conform to the evidence in which it specifically set up and relied upon the section of the contract first copied in this opinion. A recovery could not be had upon any implied contract under such pleading of an express contract. Moore v. Stanfill, 235 Ky. 372, 373, 31 S. W. (2d) 610. Not only this, but there can be no implied contract or presumed agreement where there is an express one between the parties in reference to the same subject matter. If there is an express written contract covering the transaction, its terms are controlling and the parties are bound by it and their rights are to be measured by it. 13 C. J. 243; Pringle v. Samuel, 4 Ky. (1 Bibb) 172; Morford v. Ambrose, 26 Ky. (3 J. J. Marsh.) 688; Bates v. Starkey, 212 Ky. 347, 279 S. W. 348; Damron v. Stewart & Weir, 253 Ky. 394, 69 S. W. (2d) 685.

In reviewing the question whether the defendant was entitled to a peremptory instruction, we, of course, consider all the evidence in the aspect most favorable to the plaintiff. That aspect is that the express company, under the contract providing that the ice company should "supply, sell and deliver or cause to be supplied, sold and delivered," ice as it "may from time to time direct," suddenly called upon the ice company to prepare to furnish immediately an unanticipated, extraordinary quantity and then failed to take it. The ice company had prepared to take care of the number of cars previously estimated, which was the customary manner of dealing. It was misled by the emergency demand. If there was a loss proximately resulting, it ought to be borne by the express company. Hence the defendant was not entitled to a peremptory instruction.

But the loss is to be measured by the price it had agreed to pay and not what the ice cost the other party. Had the express company taken all of the ice it would have paid $4.50 a ton placed in the car and bunkers and no more. The same would be true if the ice company had procured this ice for less than its sale price. It cannot be required to pay more than the contract price if it did not take the ice but permitted it to be wasted.

In his testimony the appellee's president estimated

that perhaps 50 per cent. of the ice purchased was disposed of in icing cars or in its retail trade. Its counsel submit figures taken from the record which they say show that only 25 per cent. was so used. On the other hand, counsel for appellant calculate that most of the ice was used. Finding that it was costing more to handle the purchased ice than was being realized from it, the balance was thrown out at the plant and the manufacturing of ice was resumed. The appellee's evidence is that the handling of this ice and the impracticability of putting it in storage (for after ice begins to melt the blocks stick together when stored) resulted in an expense and loss much greater than the amount received for the quantity disposed of.

It was the duty of the plaintiff when it found out that the surplus ice would not be taken by the express company to use all reasonable means to prevent or minimize the loss. United States Bond & Mortgage Corporation v. Berry, 249 Ky. 610, 61 S. W. (2d) 293. It may have been possible for the company to have placed this ice on the market and by thus disposing of it for some price have relieved itself in part at least from the consequences of the express company's alleged default.

The instructions authorized and the jury found a verdict for the plaintiff for the entire cost of the purchased ice without any consideration being given for that which was sold by the ice company, or for any question of failure to exercise reasonable diligence to minimize the loss. If the judgment should stand the result would be that the plaintiff would receive more than double pay, for at least 25 per cent., and perhaps 50 per cent., of the ice, and pay also for that which may have been lost through its failure to use any effort to dispose of the balance to others than the defendant, or otherwise protect itself.

The judgment is accordingly reversed.