RENDERED AUGUST 24, 2017
TO BE PUBLISHED

# Supreme Court of Kentucky

### 2015-SC-000435-DG

HUGHES AND COLEMAN, PLLC                 APPELLANT

ON REVIEW FROM COURT OF APPEALS
V.                 NO. 2013-CA-002074-MR
HARDIN CIRCUIT COURT NO. 13-CI-00166

ANN CLARK CHAMBERS, EXECUTRIX OF            APPELLEE
THE ESTATE OF JAMES W. CHAMBERS,
DECEASED

## OPINION OF THE COURT BY JUSTICE WRIGHT

### REVERSING

Personal-injury law firm Hughes & Coleman was hired by Travis Underwood after he was injured in a car crash. Underwood eventually became dissatisfied with the firm and fired them. Shortly after discharging Hughes & Coleman and hiring another attorney, Underwood agreed to a final settlement of his claims. This appeal asks whether Hughes & Coleman is entitled to be compensated for their services rendered before being fired. Our precedent entitles a discharged lawyer to receive, on a quantum meruit basis, a portion of a contingency fee on a former client's recovery—so long as the termination was not "for cause." Because Hughes & Coleman's firing was not for cause under this rule, the firm is entitled to quantum meruit compensation.

## I. Background

On October 1, 2012, Travis Underwood was injured when a commercial truck crashed into the vehicle he was driving. His injuries required hospitalization and other medical treatment, and forced him to miss about five weeks of work. The truck driver was apparently (at least mostly[1]) at fault.

On October 9, Underwood received a so-called Personal Injury Protection (PIP), or no-fault,[2] payment of $200 from his insurer, Progressive, to replace one week's lost wages in the amount prescribed by KRS 304.39-130. On October 18, Progressive disbursed another $990.06 of Underwood's PIP benefits to pay two medical bills.

On October 23, Underwood hired the law firm Hughes & Coleman to represent him in his motor-vehicle personal-injury matter. Their agreement provided for Hughes & Coleman to be paid on a contingency-fee basis and included, among other terms, that the firm would "assist the client in submitting medical bills for payment to any responsible insurance carrier or agency." Attorney Judy Brown handled most of the pre-litigation work in the case, while another attorney, Brent Travelsted,[3] primarily worked the case once it entered active litigation in January 2013. The firm's non-lawyer personnel also provided substantial assistance under the attorneys' supervision and

---

[1] There was some question whether Underwood's own negligence may have contributed to causing the crash and the extent of his injuries because of evidence that he was speeding and not wearing a seat belt.

[2] We use the synonymous labels *no-fault* and *PIP* interchangeably.

[3] Sadly, Travelsted passed away in 2013.

2

direction. The firm maintained, as the trial court put it, "a highly meticulous database ... [that] document[ed] every event (e.g. letter, telephone call, settlement offer)" related to its representation of Underwood.

Two days after Underwood retained its services, Hughes & Coleman mailed Progressive a letter advising the insurer of Underwood's PIP claim and requesting, under KRS 304.39-241, that it reserve all no-fault benefits to "pay bills or lost wages only as directed by Hughes & Coleman." Through further communications with Progressive, the firm learned that Underwood had a total of $20,000 in PIP coverage—$10,000 in basic reparation benefits (BRB) plus $10,000 in added reparation benefits (ARB). *See* KRS 304.39-020(1), (2); KRS 304.39-140. The firm also learned that Underwood had not provided to Progressive any physician statements or wage-verification documents required to verify his entitlement to further lost-wage payments. *See* KRS 304.39-280. Despite repeated requests from Hughes & Coleman, Underwood never provided these documents.

On November 6, Hughes & Coleman mailed Progressive another letter, this time asking it to release Underwood's remaining no-fault benefits of $18,809.94 by check payable to Underwood and the firm. To support the request and show that Underwood's covered losses would easily exceed that amount, Hughes & Coleman attached a bill totaling $71,812.40 from Underwood's stay at the University of Louisville Hospital. The firm received the check on November 30. That same day, they mailed Underwood a "Power of Attorney" document, which he signed a couple days later. This limited power of

3

attorney authorized Hughes & Coleman "to endorse [Underwood's] name to a settlement draft for the purpose of depositing [the outstanding PIP] funds in [the firm's] escrow account pending final distribution."

On December 7, despite Underwood's not providing any verifying documentation, Hughes & Coleman issued him a check for $973 from the escrowed funds for lost wages. This was calculated by applying the $200-per-week statutory rate to the four weeks and three days that he had not worked or been already compensated for.[4] Later, Hughes & Coleman cut another check from the escrowed funds for $3,492.88—a negotiated full-satisfaction of the University of Louisville Hospital bill. *See* KRS 304.39-245. This left $14,344.06 remaining in the escrow account.

By January 2013, Hughes & Coleman decided that the claim needed to enter litigation, and Travelsted took over primary control of the case. On January 23, Underwood authorized Travelsted's filing suit on his behalf. Travelsted then began negotiating a settlement with the tortfeasor's insurer, and by February, their back and forth had culminated in the insurer offering $145,000, which Underwood rejected. Hughes & Coleman's case-management notes show that Travelsted had valued the case at $200,000 or more and recommended against settling for less than that amount.

---

[4] Underwood returned to work on November 8. Because Progressive had already paid him for the week of October 1–5, his remaining missed time included October 8–12, 15–19, and 22–26; October 29–November 2; and November 5–7.

Unfortunately, Underwood's (and his mother's[5]) relationship with his counsel deteriorated. On March 13, Underwood fired Hughes & Coleman. In her email discharging the firm and requesting the case file and remaining escrow balance, his mother explained:

> One of the reasons that we are letting you go is, the escrow money could have been given to Travis when he needed the money but we were not told that, we were told that you all had to take it and put it in escrow. We have found out that this was not required like we were made to think it was.

On March 18, Hughes & Coleman sent Underwood the remaining escrow balance of $14,344.06.

Underwood then hired new counsel, James Chambers,[6] to represent him. Shortly thereafter, negotiations with the tortfeasor's insurer concluded with the parties' agreeing to a final settlement of $200,000, resulting in the contingency attorney fee of $66,660[7] that is the subject of this dispute.

Hughes & Coleman asserted an attorney's lien on that fee under KRS 376.460, claiming that it was entitled to a quantum meruit share of the fee as compensation for its services rendered to Underwood before being terminated. Chambers challenged the firm's entitlement to any portion of the

---

[5] Underwood's mother played a large role assisting him after the crash, and much or most of Hughes & Coleman's correspondence about the case was actually with her.

[6] After the Court of Appeals issued its opinion in this case, Chambers also sadly passed away. As a result, Ann Clark Chambers, as executrix of his estate, has been substituted as appellee.

[7] Although the amount of the one-third contingency fee is $66,666.67, the parties agreed to $66,660, presumably to make the math simpler. These funds are being held by Selective Insurance Company of America, the tortfeasor's insurer, under court order pending resolution of this dispute.

fee, insisting that its firing was "for cause" and so barred its quantum meruit claim. The firing's justifiable cause, Chambers argued, was Hughes & Coleman's supposed mishandling of Underwood's no-fault benefits, which he maintained was both unethical and legally unauthorized. Despite Hughes & Coleman's willingness to do so, Chambers declined to participate in the Kentucky Bar Association's fee arbitration process. *See* SCR 3.810.

The circuit court, then, held an evidentiary hearing where it heard testimony from pre-litigation attorney Brown and members of Hughes & Coleman's staff who worked on Underwood's case. The firm also submitted deposition testimony from Reford Coleman (no relation to the firm's named principal), who testified as an expert in motor-vehicle personal-injury litigation. He explained that it was common practice to handle clients' no-fault benefits as Hughes & Coleman had handled Underwood's. He also opined that the firm had provided diligent service, that Underwood's case appeared to have been progressing well, and that there was nothing about the representation that he considered good cause for discharging the firm. Hughes & Coleman also submitted its entire 503-page, contemporaneously generated file for Underwood's case from its case-management system, which the trial court found to be "extremely detailed and meticulous." Chambers's evidence included only notarized statements from Underwood and his mother; he did not call any witnesses or personally testify at the hearing.

Relying primarily on Coleman's testimony and the case-management records, the trial court concluded that Hughes & Coleman's representation of

Underwood was not deficient and that the firing was without cause. The court rejected Chambers's contention that the firm's communications with Underwood had been inadequate, finding "substantial evidence showing that [Hughes & Coleman] maintained excellent communication with [Underwood] and returned ... telephone calls promptly." The trial court also rejected Chambers's argument that Hughes & Coleman improperly withheld or otherwise mishandled Underwood's no-fault benefits.

Having concluded that Hughes & Coleman was discharged without cause, the trial court looked to the factors provided in SCR 3.130-1.5 and apportioned 75% of the attorney fee to the firm and 25% to Chambers. In the trial court's view, that was "the allocation that most fairly recognize[d] both Hughes & Coleman's labor and Chambers'[s] ability to settle." So the court ordered that $49,995 be paid to Hughes & Coleman and $16,665 to Chambers.

Chambers appealed to the Court of Appeals only the issue of whether Hughes & Coleman's termination was "for cause."[8] The Court of Appeals reversed, holding that in its handling of Underwood's no-fault benefits, Hughes & Coleman had "maintained a position unsupported by law and adverse to its client," which "constituted valid cause" for Underwood's terminating its services. So the Court of Appeals reversed the trial court's judgment apportioning 75% of the contingency fee to the firm.

---

[8] Because the trial court's quantum meruit fee apportionment was not appealed and is no longer a live issue in this case, we leave for another day discussion of how to go about assessing the reasonable value of the discharged lawyer's services.

We granted Hughes & Coleman's petition for discretionary review.

## II. Analysis

With *Baker v. Shapero*, 203 S.W.3d 697 (Ky. 2006), this Court brought Kentucky in line with most other jurisdictions' treatment of a discharged attorney's entitlement to compensation on a former contingency-fee client's recovery. Before that, a Kentucky attorney whose client discharged her without cause was entitled to the agreed-upon contingency fee on her former client's final recovery (less the "reasonable cost" of the replacement attorney's services), despite having not completed the contracted-for work. *See LaBach v. Hampton*, 585 S.W.2d 434, 436 (Ky. App. 1979). This, the Court noted, was an "extreme minority position." *Baker v. Shapero*, 203 S.W.3d at 699. So the Court overturned *LaBach* and held, instead, that "when an attorney employed under a contingency-fee contract is discharged without cause before completion of the contract, he or she is entitled to fee recovery on a *quantum meruit* basis only, and not on the terms of the contract." *Id.*

The term *quantum meruit*—literally meaning "as much as he has deserved"—refers generally to the "reasonable value of services." Black's Law Dictionary (10th ed. 2014). It is an equitable remedy entitling a person who has rendered services to recover payment for the reasonable value of those services. Its focus, then, is on the value of the benefit conferred to the other person—in the attorney-fee setting, quantum meruit recovery seeks to compensate the discharged attorney for the value of the services rendered before being fired. But the doctrine's equity roots limit its reach.

8

*Baker v. Shapero*'s quantum meruit fee-recovery rule applies only when an attorney is discharged "without cause"—the negative implication being that an attorney forfeits any claim to a fee when validly discharged "for cause." But when exactly does a discharge amount to being "for cause"? That is an important question because, whatever it means, the *Baker v. Shapero* rule directs that an attorney who is discharged for cause recovers no fee at all—the lawyer, by doing whatever reprehensible thing or things that precipitated the for-cause firing, has lost her right to be compensated for the beneficial services she provided the client.

Since *Baker v. Shapero*, we have twice had occasion to address the related scenario of lawyers voluntarily withdrawing as counsel. Whether a withdrawn lawyer may recover a quantum meruit fee on his or her former client's ultimate recovery turns on whether the lawyer's reason for withdrawing constituted "good (or just) cause." *Lofton v. Fairmont Specialty Ins. Mgrs.,* 367 S.W.3d 593, 597–98 (Ky. 2012); *see also B. Dahlenburg Bonar, P.S.C. v. Waite, Schneider, Bayless & Chesley Co.,* 373 S.W.3d 419, 423 (Ky. 2012). In *Lofton,* we held that disagreeing with a client about the case's settlement value is not sufficient cause to allow a lawyer to withdraw and still receive a quantum meruit fee—because that simple conflict does not merit terminating the entire lawyer-client relationship, the lawyer's withdrawal forfeited the fee. 367 S.W.3d at 597–98. Likewise, only two months later in *B. Dahlenburg Bonar,* we held that a lawyer forfeited her entitlement to a quantum meruit fee when she withdrew as co-counsel in a class action over worries that her clients' position

9

jeopardized her relationships with other clients and colleagues. 373 S.W.3d at 422–24.

Although those cases provide some guidance, they do not exactly provide the answer. Ending a lawyer-client relationship cancels the employment contract under which the client promised to pay the lawyer for his or her services. In this respect, situations where the lawyer ends the representation are different from those where the client does so.

When the lawyer withdraws, the ethical and contractual duties and obligations owed to the client are paramount to the analysis. Broadly speaking, attorneys must, among other things, competently represent and zealously advocate their clients' best interests. *See* SCR 3.130-1.1; SCR 3.130, Preamble: A Lawyer's Responsibilities, at III. This Court rightly held in *Lofton* and *B. Dahlenburg Bonar*, respectively, that neither simple disagreements with clients over claim values, nor latent fears that the representation will somehow jeopardize the lawyer's relationships with third-parties, justify lawyers' casting aside their clients and the duties otherwise owed to them. Absent sufficient justification in the ilk of an irretrievable breakdown of the lawyer-client relationship, *see* 7A C.J.S. Attorney & Client § 329 (June 2017), a lawyer who voluntarily withdraws from the representation will not be permitted to later insist on receiving a fee on the former client's ultimate recovery. Those prior cases rest largely on whether a lawyer's withdrawing was at odds with her ethical or contractual obligations to the client. It does not exactly translate to

situations, as here, where it is the client who exercises his absolute prerogative to terminate the attorney-client relationship.

Where the client discharges the lawyer, different considerations are in play. As Maryland's highest court has explained, the quantum meruit rule seeks to "strike a balance between the client's absolute right to discharge his or her attorney and the attorney's right to fair compensation for services competently rendered prior to discharge." *First Union Nat'l Bank v. Meyer, Faller, Weisman & Rosenberg, P.C.*, 723 A.2d 899, 910 (Md. 1999). Striking that balance requires recognizing a client's "basis" for discharging her attorney as distinct from "cause" justifying forfeiture of the attorney's compensation. *Somuah v. Flachs*, 721 A.2d 680, 691 (Md. 1998).

A client may have a good-faith reason for being unhappy with her current lawyer that is not based on any sort of wrongful conduct by the lawyer. Although the client may feel that she had a good reason to discharge her attorney and hire a new one, that alone does not justify forfeiture of the discharged attorney's right to be paid for the services she provided before being fired. Consider *Lofton*'s facts, but flipped: lawyer and client disagree about settlement value, but instead of the lawyer withdrawing over the disagreement as in *Lofton*, the client fires the lawyer. Just as this simple disagreement is not sufficient cause for a withdrawing lawyer to later insist on being paid, it is not sufficient cause for a discharged lawyer to be barred from being fairly compensated for services rendered.

11

Instead, to justify fee forfeiture, the "cause" of the discharge must involve some sort of wrongful conduct by the attorney, resulting in an irreconcilable breakdown in the attorney-client relationship. It appears that most other jurisdictions also limit fee forfeitures by discharged attorneys in this way. *See, e.g., Somuah,* 721 A.2d at 688; *see also* 56 A.L.R. 5th 1, § 2[b] (orig. pub'd 1998) ("Generally, however, a complete forfeiture of attorney's fees will be warranted only when the attorney's 'clear' violation of a duty is found to have so destroyed the attorney-client relationship that the attorney is considered to no longer have a right to compensation for services rendered prior to the point of his or her discharge."). Thus, we now hold that an attorney's discharge should be deemed "for cause"—so as to bar the fired attorney from recovering a fee in quantum meruit—only where the reason for the discharge is some sort of culpable conduct by the attorney.

Applying that rule here, we surmise no cause justifying forfeiture of Hughes & Coleman's quantum meruit fee. While Underwood may have felt that he had good reason to be dissatisfied with his lawyers, the trial court was correct to rule that this dissatisfaction was not a sufficient cause to bar those lawyers from being paid for the work that they performed.

When Underwood fired Hughes & Coleman, his mother explained that he was doing so because "the [PIP] money could have been given to Travis when he needed the money but we were not told that, we were told that [Hughes &

12

Coleman] had to take it and put it into escrow."[9] The Court of Appeals looked to that explanation and the statutes governing no-fault benefits and concluded that Hughes & Coleman "was terminated because it maintained a position unsupported by law and adverse to its client," which "in turn, constituted valid cause for Underwood's" discharge of the firm.

The first thing that stands out is that the Underwoods' asserted basis for terminating Hughes & Coleman misunderstands the law. Underwood was not, as he and his mother had apparently come to believe, entitled to receive all of the remaining PIP funds "when he needed the money." Indeed, those funds' use is statutorily restricted to compensate him only "for loss from injury" from the car crash. KRS 304.39-040. *Loss* is also defined: it means "accrued economic loss consisting only of medical expense, work loss, [and] replacement services loss." KRS 304.39-020(5). So only to the extent that Underwood showed proof of those sort of economic losses was he entitled to receive PIP benefits; he was not entitled to them merely because he needed the money. The record also shows that Underwood failed to provide to Hughes & Coleman verifying documentation supporting his entitlement to no-fault benefits, despite the

_____

[9] In their notarized statements, Underwood and his mother explained that their unhappiness with Hughes & Coleman also centered on feeling unattended to and that the firm's attorneys were not pushing hard enough to attain a settlement value that Underwood believed he deserved. But in the end, the crux of their dissatisfaction appears to have been, as Underwood put it in his statement, that Hughes & Coleman "never told [him and his mother] that [he] was entitled to receive the full amount [of the PIP funds]," adding that "to find out that [he] could have gotten [all of the PIP funds] … was it."

13

firm's repeated requests that he do so to allow them to begin disbursing the escrowed funds.

More to the point, however, the Court of Appeals erred in concluding that Hughes & Coleman's handling of Underwood's PIP funds was unlawful or unethical. That ruling far too narrowly construed the lawyers' ethical and contractual obligations. Contrary to that court's belief that the firm's handling of the PIP funds somehow put its interests at odds with its client's, Hughes & Coleman's spearheading Underwood's benefits disbursement was completely aboveboard. Indeed, that practice seems almost integral to fully servicing a motor-vehicle personal-injury client's needs—it should be commended and encouraged, not punished.

While injured insureds are entitled by statute to direct how their PIP benefits are to be paid, *see* KRS 304.39-241, the disbursement of PIP funds remains subject to the statutory restrictions on their use mentioned above. Reparation obligors have the right to sue to recover benefits that were not actually payable under the statute, but were in fact paid based on misrepresentations by an insured. *See* KRS 304.39-210(4). So Hughes & Coleman was not only authorized but legally bound to insist on proper documentation from Underwood to ensure that the escrowed funds were disbursed lawfully, not according to his or his mother's whims. *See* KRS 304.39-210(1). Requiring such documentary proof from Underwood did not somehow put the firm's interests at odds with its client's.

14

Perhaps Hughes & Coleman could have better explained this to Underwood. Hindsight being what it is, it is tempting to criticize them for not being crystal clear about how PIP benefits work and what the firm's role would be exactly in helping to disburse them. Yet the trial court found that Hughes & Coleman's communications with Underwood were reasonable and adequate, emphasizing the fairly robust lines of communication with the Underwoods seen in the case-management records (while apparently putting less weight in the Underwoods' notarized statements). Given the voluminous records Hughes & Coleman kept documenting their correspondence with Underwood, that finding was supported by substantial evidence.

Still, even if the firm's communications to Underwood about his PIP benefits were not perfectly clear to him, nothing suggests that they were intentionally misleading or wrongful in some way. Indeed, even if we were to accept the argument that the lawyers' PIP-related communications to Underwood fell short of meeting their ethical obligations of reasonably explaining, *see* SCR 3.130-1.4(b); informing, *see* SCR 3.130-1.4(a)(3); and consulting with their client, *see* SCR 3.130-1.4(a)(5); that would not alone establish that Underwood discharged them "for cause" under *Baker v. Shapero.* Whether a quantum meruit fee is forfeited is not governed by the ethics rules and standards—guided perhaps, but not governed. *Cf. Lofton,* 367 S.W.3d at 596 (differentiating "good cause" for withdrawing as counsel with court's leave under SCR 3.130-1.16(b), from the higher standard for withdrawing and receiving quantum meruit compensation). Even if Hughes & Coleman neglected

15

to fully explain to Underwood, in clear and understandable terms, his PIP benefits and their handling of them, that does not amount to the sort of culpable conduct that forfeits a discharged lawyer's right to be paid for services rendered.

In sum, Hughes & Coleman is entitled to quantum meruit apportionment of the contingency fee, as the trial court ordered. We need not address the second step in the quantum meruit fee assessment—the reasonableness of the trial court's apportionment—because Chambers did not appeal that part of the judgment.

### III. Conclusion

We reverse the Court of Appeals and reinstate the circuit court's judgment awarding Hughes & Coleman a quantum meruit portion of the contingency fee on Underwood's ultimate recovery.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Peter Lucas Ostermiller

COUNSEL FOR APPELLEE:

Charles E. Theiler II
Ashby Angell.