RENDERED: MARCH 22, 2018
TO BE PUBLISHED

Supreme Court of Kentucky FINAL

2016-SC-000666-DG

DATE 4/12/18 Kim Redmon, DC

VANHOOK ENTERPRISES, INC.             APPELLANT

               ON REVIEW FROM COURT OF APPEALS
V.                 CASE NO. 2015-CA-001977-MR
             PULASKI CIRCUIT COURT NO. 13-CI-00922

KAY & KAY CONTRACTING, LLC            APPELLEE

**OPINION OF THE COURT BY JUSTICE CUNNINGHAM**

**REVERSING AND REINSTATING**

The United States Small Business Administration ("SBA") regulates the Historically Underutilized Business Zone ("HUBZone") Program. 15 U.S.C. § 657a. Through the HUBZone program, the SBA provides contracting assistance to small businesses seeking federal government contracts. To qualify as a HUBZone-eligible contractor, one must be a small business within an economically distressed area. *Id.*

In 2010, the U.S. Army Corps of Engineers sought bids from HUBZone-eligible contractors to replace the Cumberland Bridge Street Bridge over the Poor Fork of the Cumberland River in Cumberland, Kentucky. The HUBZone contract price was $1,029,394.20. Kay & Kay Contracting, LLC ("Kay & Kay"),

a large construction firm in London, was interested in the construction job, but was not a HUBZone-eligible business.

Accordingly, Kay & Kay negotiated with Vanhook Enterprises, Inc. ("Vanhook"), a HUBZone-eligible contractor in Somerset, and entered into a series of agreements with Vanhook whereby Vanhook would apply for the HUBZone contract. Vanhook would receive the HUBZone contract price from the federal government, which it would then split with Kay & Kay as a subcontractor working on the HUBZone project. On July 7, 2010, this relationship culminated in the so-called Team Agreement between the parties, whereby Vanhook agreed to serve as the prime contractor for the HUBZone contract.

On January 13, 2011, Vanhook and Kay & Kay entered into the so-called Subcontract Agreement, which outlined services that Kay & Kay was to perform as a subcontractor under the HUBZone project. The Subcontract Agreement stated that Vanhook would pay Kay & Kay $37,500 for "Mobilization" and a $410,000 lump sum for "All Materials, Labor, Equipment[,] and applicable taxes for the construction of the Bridge Street Bridge."

Later in 2011, during construction, the parties entered into a subsequent written agreement whereby Vanhook rented equipment and an equipment operator from Kay & Kay for an additional $12,300. This agreement was expressly excluded from the Subcontract Agreement. *See* Subcontract Agreement, Exhibit A ("The lump-sum item shall include all costs associated

2

with the construction of the bridge that are *not otherwise identified as being paid separately.*" (emphasis added)).

After completion of the bridge, Vanhook remitted an undisputed $459,790.04 to Kay & Kay under the Subcontract Agreement and subsequent written agreement: $37,500 for "Mobilization," the $410,000 lump sum, and $12,300 for the additional equipment rental and operator contract. On December 8, 2011, Kay & Kay Vice President Ron Pfaff executed a writing titled "Affidavit and Waiver of Lien, Acknowledgement of Full and Final Payment." Therein, Pfaff swore that Kay & Kay had been fully compensated for materials provided and services performed under the Subcontract Agreement by "full and final payment due including any applicable retainage." However, despite its letter, Kay & Kay continued to seek additional payment from Vanhook.

In the summer of 2013, Kay & Kay sued Vanhook for breach of contract and *quantum meruit* in the alternative, asserting that the parties had entered into a separate agreement after the Team Agreement, but *before* the Subcontract Agreement—the so-called Prime Agreement. Under that alleged agreement, Kay & Kay claimed that Vanhook was obligated to pay greater than the lump-sum price. Kay & Kay claimed it performed 76% of total work under the 43-bid item project—$785,814.16 of the $1,029,394.20 HUBZone contract price—and, thus, performed $326,024.12 worth of work outside of the Subcontract Agreement's contract price. Kay & Kay maintained that the expenses it incurred in excess of the $410,000 lump sum were for services it performed outside of the scope of the Subcontract Agreement, and thereby

3

unjustly enriched Vanhook by rendering those services without adequate compensation.

Vanhook responded that no such Prime Agreement existed, and, even if it did, that the Subcontract Agreement superseded all prior agreements and negotiations between the parties. Therefore, Vanhook moved for judgment on the pleadings. CR 12.03. The Pulaski Circuit Court found the Subcontract Agreement to be a complete integration of the dealings between Vanhook and Kay & Kay regarding the Bridge Street Bridge project. Accordingly, the Pulaski Circuit Court held that the alleged "additional work" was included within a plain, ordinary reading of Exhibit A of the Subcontract Agreement as "any other ancillary items required to provide a complete bridge structure."

On appeal, the Kentucky Court of Appeals affirmed the trial court's finding that the Subcontract Agreement was an integration. However, the Court of Appeals held that it was unclear whether Kay & Kay's "additional work" fell within the "any other ancillary items" language of the contract. In other words, it was unclear whether the Subcontract Agreement was a full integration or a partial integration. The Court of Appeals declared that whether the "additional work" Kay & Kay allegedly performed was covered by the Subcontract Agreement was an issue of fact for the jury. Vanhook appealed to this Court, and we granted discretionary review.

## Analysis

Interpretation of a written contract is a matter of law to be decided by the trial court. *3D Enters. Contracting Corp. v. Louisville & Jefferson Cnty. Metro.*

4

*Sewer Dist.*, 174 S.W.3d 440, 448 (Ky. 2005). The Pulaski Circuit Court granted Vanhook's motion for judgment on the pleadings, which "should be granted if it appears beyond doubt that the nonmoving party cannot prove any set of facts that would entitle [that party] to relief." *Schultz v. Gen. Elec. Healthcare Fin. Svcs., Inc.*, 360 S.W.3d 171, 176 (Ky. 2012) (internal citation omitted). A motion for judgment on the pleadings is treated akin to a motion "for summary judgment[,] and [is] disposed of in that manner." *Hoke v. Cullinan*, 914 S.W.2d 335, 338 (Ky. 1995).

"Appellate review of a summary judgment involves only legal questions and a determination of whether a disputed material issue of fact exists. So we operate under a *de novo* standard of review with no need to defer to the trial court's decision." *Shelton v. Kentucky Easter Seals Soc'y, Inc.*, 413 S.W.3d 901, 905 (Ky. 2013) (internal citations omitted). "The interpretation of a contract, including determining whether a contract is ambiguous, is a question of law to be determined *de novo* on appellate review." *Kentucky Shakespeare Festival, Inc. v. Dunaway*, 490 S.W.3d 691, 695 (Ky. 2016) (internal citation omitted).

## Parol Evidence Rule

Within contract law, the parol evidence rule is a substantive rule that regulates the admissibility of written or oral evidence introduced to vary a written contract. Under the parol evidence rule, an unambiguous writing intended by the parties to be a full and final manifestation of their agreement cannot be supplemented, contradicted, or modified by evidence of prior written

5

or oral agreements. *Childers & Venters, Inc. v. Sowards*, 460 S.W.2d 343, 345 (Ky. 1970).

Initially, we must determine whether the writing constituted a final expression of the agreement between the parties at the time it was adopted. First, we ask whether the contested writing was intended to be the final manifestation of their agreement, a preliminary draft, or merely a step in negotiations like a letter of intent? And, if a manifestation of intent exists, was it a complete integration of the entire deal or only a partial integration?

As a matter of law, a document which on its face appears to be a complete integration is a complete integration. *See, e.g., Kentucky Shakespeare Festival*, 490 S.W.3d at 695 (quoting *3D Enters. Contracting Corp.*, 174 S.W.3d at 448) ("When no ambiguity exists in the contract, we look only as far as the four corners of the document to determine the parties' intentions."). Here, the merger clause at Paragraph XXV of the Subcontract Agreement categorically states that the parties intended the Subcontract Agreement to "represent[] the *entire and integrated agreement* between the Contractor and Subcontractor and *supercedes* [*sic*] *all prior negotiations, representations, or agreements*, either written or oral . . . ." (emphasis added).

Kay & Kay contends that the Subcontract Agreement was only a partial integration as to Mobilization and Bridge Street Bridge Construction—bid items 1 and 10 of the 43-item bid list from the Army Corps of Engineers—and that the other work it provided was outside of the scope of those two items. However, contrary to Kay & Kay's argument, Paragraph III of the Subcontract

6

Agreement states that the Subcontract includes, among other documents: the Subcontract Agreement; the prime contract between Vanhook and the Army Corps of Engineers; and any other documents specifically incorporated by reference. Thus, by its own terms, the Subcontract Agreement is a full integration of Vanhook and Kay & Kay's contract for Kay & Kay's subcontracting work on the Bridge Street Bridge.

Because the merger clause states that the parties intended the Subcontract Agreement to be a complete integration, to embody the "entire integrated agreement" between Vanhook and Kay & Kay which supersedes all prior agreements, *any* evidence of a prior written or oral agreement is inadmissible to vary its terms. Therefore, the trial court properly found that any evidence of the alleged Prime Agreement was inadmissible to vary the Subcontract Agreement's terms.

### *Quantum Meruit*

Where there is no valid contract, an action for *quantum meruit* may provide the aggrieved party the equitable remedy of restitution. Restitution is intended to return the value of the benefit conferred to the aggrieved party when the other party is unjustly enriched at the expense of the aggrieved. *Hughes & Coleman, PLLC v. Chambers*, 526 S.W.3d 70, 74-75 (Ky. 2017).

Here, the Subcontract Agreement incorporated the prime contract between Vanhook and the Army Corps of Engineers by reference in Paragraph III B. The prime contract included a list of 43 bid items for goods and services under the HUBZone contract that Vanhook promised to provide or perform.

7

Exhibit A of the Subcontract Agreement specifically addressed two of those bid items that Vanhook subcontracted to Kay & Kay: mobilization and construction of the Bridge Street Bridge. Most notably, the bridge construction item includes a catch-all which states that Kay & Kay is to perform "any other ancillary items required to provide a complete bridge structure."

Kay & Kay argues it is entitled to restitution for the costs it incurred above the Subcontract Agreement's contract price, because Kay & Kay performed more than just bid items 1 and 10 to provide the complete bridge structure. However, that argument is contrary to the plain meaning of the Subcontract Agreement. As Kay & Kay has stated, it seeks restitution for the excess costs it incurred in building the bridge. Those costs fall within the terms of the contract as "any other ancillary item [of the 43-item list] required" to finish the bridge, and "a written instrument will be strictly enforced according to its terms." *Mounts v. Roberts*, 388 S.W.2d 117, 119 (Ky. 1965).

Thus, the Subcontract Agreement covers the subject matter of the alleged "additional work" performed by Kay & Kay. Consequently, the Prime Agreement, if it existed at all, was merely a chain in the negotiations that led to the final manifestation of the deal embodied in the Subcontract Agreement. A valid written contract exists for construction of the Bridge Street Bridge, and "there can be no implied contract or presumed agreement where there is an express one between the parties in reference to the same subject matter." *Fruit Growers Express Co. v. Citizens Ice & Fuel Co.*, 112 S.W.2d 54, 56 (Ky. 1937). Therefore, Kay & Kay is not entitled to relief under a *quantum meruit* theory.

8

## Conclusion

For the forgoing reasons, we hereby reverse the Court of Appeals and reinstate the Pulaski Circuit Court's judgment consistent with this opinion.

All sitting. Hughes, Keller, Venters, and Wright, JJ., concur. Minton, C.J., concurs by separate opinion in which VanMeter, J., joins.

MINTON, C.J., CONCURRING: The majority provides a well-written contract-law analysis of the issues presented in this case, with which I fully concur. But I write separately to emphasize that this case can be decided on a principle that this state has recognized for almost 100 years, "that any conduct or contract of an illegal, vicious, or immoral nature cannot be the basis of a legal or equitable proceeding...."[1]

As the majority recognizes, the contract between Vanhook and Kay & Kay is subject to the rules and regulations of the HUBZone Program. Two regulations, 13 C.F.R. § 126.700 and 13 C.F.R. § 125.6, are of particular relevance in this case.[2]

---

[1] *Robenson v. Yann*, 5 S.W.2d 271, 274 (Ky. 1928); *see also McMullen v. Hoffman*, 174 U.S. 639, 662 (1899) ("It is no part of a court of justice to aid either in carrying out an illegal contract, or in dividing the proceeds arising from an illegal contract between the parties to that illegal contract.").

[2] We note that, as the majority points out, the written agreements between the parties arose between 2010 and 2011, so we located the particular versions of these regulations applicable to this case. When we refer to these regulations, we are referring to the version of 13 C.F.R. § 126.700 promulgated on June 17, 2005, and taking effect on August 30, 2005, and of 13 C.F.R. § 125.6 promulgated on October 1, 2008, and taking effect on October 31, 2008. 13 C.F.R. § 126.700, 70 FR 51243-01, 2005 WL 2071548 (August 30, 2005); 13 C.F.R. § 125.6, 73 FR 56940-01, 2008 WL 4410591 (October 31, 2008). For the language of relevance regarding 13 C.F.R. § 125.6, see 69 FR 29411-01, 2004 WL 1143809 (June 23, 2004).

The applicable version of 13 C.F.R. § 126.700, promulgated under the authority given by Congress to the Small Business Administration under 15 U.S.C. § 657a, is entitled "What are the performance of work requirements for HUBZone contracts?" 13 C.F.R. § 126.700(a) states, "A prime contractor receiving an award as a qualified HUBZone SBC must meet the performance of work requirements set forth in § 125.6 of this chapter." 13 C.F.R. § 125.6, in turn, is entitled, "Prime contractor performance requirements (limitations on subcontracting)." A list of threshold cost percentages that a subcontractor can receive and not violate HUBZone law appears in 13 C.F.R. 125.6(c). And 13 C.F.R. 126.700(b) provides a list of those threshold cost percentages.

We do not know exactly how the facts of this case square with these federal rules and regulations. But both parties concede that if the parties drew the contract to provide Kay & Kay with the money it asserts in its quantum meruit claim today, it would violate federal law, *i.e.* the HUBZone statutes and regulations, which provide certain contract amounts that a non-HUBZone-qualifying subcontractor can contract for without violation. Even if the parties did not concede this point, their actions speak for themselves.

Kay & Kay and Vanhook framed their relationship in this case so as not to violate federal law—their Team Agreement was drawn up to avoid such an issue. Now, Kay & Kay asserts that Vanhook owes it more money, the giving of which would fly in the face of their constructed relationship because it would allow Kay & Kay to do the very thing federal law prevents—awarding a non-HUBZone-qualifying entity more of the contract price than federal law allows.

Kay & Kay attempts to justify its position by asserting its claim under a quantum-meruit theory instead of a breach-of-contract theory, positing that receiving money under a quantum-meruit theory would not violate federal law because receipt of this money arose from equity rather than contract law. The fact that Kay & Kay did not pursue a breach-of-contract claim essentially amounts to an admission that it cannot pursue a breach-of-contract claim in this case because such claim would acknowledge that an illegal contract exists, meaning a contract that awards Kay & Kay more money than what federal law allows.

Equity cannot be a vehicle to make illegal conduct legal. Kay & Kay cannot pursue a quantum-meruit claim to recover damages, the receipt of which would violate the law.

Because Kay & Kay is attempting to recover damages, the receipt of which would violate federal law, I would reverse the Court of Appeals and reinstate the trial court's decision.

VanMeter, J., joins.


COUNSEL FOR APPELLANT:

Larry F. Sword
SWORD & BROYLES

COUNSEL FOR APPELLEE:

Darren J. Duzyk

11