RENDERED: FEBRUARY 19, 2021; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2019-CA-1839-MR

VOGT, THE CLEANERS, INC. APPELLANT

APPEAL FROM JEFFERSON CIRCUIT COURT
v. HONORABLE JUDITH E. MCDONALD-BURKMAN, JUDGE
ACTION NO. 15-CI-002996

HAMHED, LLC; VERITAS ENTERPRISES,
D/B/A CAFÉ LAUNDRY; MICAH REED;
AND ERIC HEDRICK APPELLEES

OPINION
AFFIRMING

** ** ** ** **

BEFORE: CALDWELL, COMBS AND L. THOMPSON, JUDGES.

THOMPSON, L., JUDGE: Vogt, the Cleaners, Inc. appeals from orders of the

Jefferson Circuit Court which found in favor of Appellees after a bench trial. We

find no error and affirm.

## FACTS AND PROCEDURAL HISTORY

Vogt is a laundry cleaning service owned and operated by Robert Vogt and his wife, Dana Vogt. Vogt became aware of a government contract for doing laundry for an Army cadet program at Fort Knox, Kentucky during the summer of 2014. Vogt was not a certified government contractor and could not bid on the job. Vogt contacted Hamhed, LLC, which was a certified government contractor. Vogt wanted Hamhed to act as the general contractor for the contract and subcontract the cleaning duties to it. During this time Eric Hedrick, Alan Berry,[1] and John Obermeier[2] owned Hamhed.

The government proposal information indicated that the Army estimated there would be 7,500 cadets at the program. The Army also estimated that there would be 67,080 t-shirts, 67,080 pairs of socks, 67,080 uniform tops, 67,080 pairs of underwear, 67,080 other types of t-shirts, 67,080 pairs of shorts, 22,360 pairs of jeans, 22,360 shirts, 22,360 towels, 22,360 wash cloths, 22,360 hand towels, and 22,360 laundry bags. Based on this information, Hamhed requested that Vogt prepare a bid. Vogt did so and indicated it could meet the Army's estimated laundry needs for $377,844.00. As an example of what the bid looked like, Vogt indicated it would charge $0.45 per t-shirt, with the estimated

---

[1] Mr. Berry left Hamhed, LLC before this lawsuit began.

[2] Mr. Obermeier had no dealings with the Vogts or the Army concerning this contract.

number of t-shirts being 67,080.00. This would make a total of $30,186.00 for t-shirts. Vogt then sent this bid to Hamhed. Hamhed increased each price point $0.02 to create a profit margin for it. For example, Hamhed turned Vogt's $0.45 per t-shirt bid into $0.47. When Hamhed turned the bid into the Army, the overall price had increased to $386,604.40. This indicated an $8,720.40 profit margin for Hamhed.

Hamhed was awarded the Army contract. The Army contract indicated Hamhed would only get paid based on the actual number of pieces of laundry that were laundered, not based on the estimated number. Hamhed then hired Vogt as its subcontractor. There was no written contract between Hamhed and Vogt. At first, the Army was only going to pay one lump sum payment at the conclusion of the contract; however, Vogt needed periodic payments in order to keep paying for supplies and labor costs. As the job progressed, Vogt began keeping a tally of the number of items it laundered. Vogt would then send these tally sheets to Hamhed, which would pass them on to the Army. The Army would then pay Hamhed for the number of items cleaned, and Hamhed would then pay Vogt.

As it turns out, the number of cadets who participated in the summer program was far fewer than estimated by the Army. Consequently, the number of items being laundered by Vogt was significantly lower, and Vogt was not receiving

as much money as it anticipated. A meeting was held between Vogt, Hamhed, and a contact person with the Army where some aspects of the contract were renegotiated, such as how quickly the items were to be cleaned and how the items would be delivered to Vogt. Hamhed and the Army, without knowledge or input from Vogt, then began to renegotiate their contract between themselves. Since it was clear that only about 1/3 of the anticipated laundry was going to be available, and the Army had allocated $386,604.40 for the project, Hamhed convinced the Army to increase the price per piece of laundry by around 258%. Hamhed then informed Vogt that it would be increasing Vogt's payments by about 26%. It is undisputed that Hamhed did not pass the entire 258% increase on to Vogt and that Vogt did not know about the full 258% increase until much later.

After the end of the cadet program, the full $386,604.40 had not been paid out by the Army; therefore, the contract between Hamhed and the Army was altered again. This time, the Army allowed Hamhed to launder linens, such as blankets, pillows, and pillow cases. Hamhed then allowed Vogt to do this cleaning. In the end, the Army paid Hamhed a total of $386,704.00 over the course of the performance of the contract. Of that money, Vogt was paid $176,147.05 and Hamhed kept $210,556.00.

Additionally, during the course of the summer of 2014, Vogt was attempting to purchase a second laundry establishment to help facilitate the

cleaning of the Army laundry. Vogt opted to purchase a business known as the Wash House from Frank Gonzalez for $80,000.00. Mr. Gonzalez allowed the Vogts to make three payments for the business. The Vogts made the first two payments, but did not make the final payment. The Vogts were intending to use the money from the Army contract to purchase the Wash House, but because they were not receiving as much money as they anticipated, they could not make the final payment. Soon after the purchase agreement was terminated, Micah Reed, who owned Veritas Enterprises, bought the Wash House.

Vogt eventually brought the underlying action against Hamhed and Mr. Hedrick alleging breach of contract, fraud, and misrepresentation. Vogt believed it would be paid the full $377,844.00 regardless of the number of items of laundry it cleaned. Hamhed claimed that the contract was always based on a price per piece of laundry. Vogt later filed an amended complaint which brought Mr. Reed and Veritas Enterprises into the lawsuit. The amended complaint alleged that Mr. Reed and Mr. Hedrick conspired to keep Vogt from receiving the full amount of money it was entitled to so that it would default on the purchased of the Wash House and Mr. Reed and his company could then purchase it.

On December 2, 2019, after a four-day bench trial, the court found in favor of Appellees. It concluded that the contract price was based on a per piece basis and not a fixed price, that there was no breach of contract, that there was no

fraud or misrepresentation, and that there was no tortious interference with a prospective business in regard to the Wash House. Appellant moved to alter, amend, or vacate, but that motion was denied. This appeal followed.

## ANALYSIS

Vogt's first argument on appeal is that the trial court erred in finding there was no breach of contract. Vogt claims that the oral contract it had with Hamhed entitled it to $377,844.00 and that it was not contracted to be paid per piece of laundry. This is directly contrary to what the trial court found.

> The Court of Appeals [is] entitled to set aside the trial court's findings only if those findings are clearly erroneous. And, the dispositive question that we must answer, therefore, is whether the trial court's findings of fact are clearly erroneous, i.e., whether or not those findings are supported by substantial evidence. "[S]ubstantial evidence" is "[e]vidence that a reasonable mind would accept as adequate to support a conclusion" and evidence that, when "taken alone or in the light of all the evidence, . . . has sufficient probative value to induce conviction in the minds of reasonable men." Regardless of conflicting evidence, the weight of the evidence, or the fact that the reviewing court would have reached a contrary finding, "due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses" because judging the credibility of witnesses and weighing evidence are tasks within the exclusive province of the trial court. Thus, "[m]ere doubt as to the correctness of [a] finding [will] not justify [its] reversal," and appellate courts should not disturb trial court findings that are supported by substantial evidence.

-6-

*Moore v. Asente*, 110 S.W.3d 336, 353-54 (Ky. 2003) (footnotes and citations omitted).

Here, the trial court concluded that the evidence before it indicated that the contract was to be paid on a per piece basis. We agree. Hamhed was being paid on a per piece basis by the Army, Vogt was required to send in a per piece pricing sheet for the bid, and Vogt was required to send invoices or tally sheets to Hamhed in order for Hamhed to pay Vogt during the contract period. In addition, after reviewing all the testimony from this case, Mr. Hedrick and Mr. Berry both consistently testified that the contract was based on a per piece price and not a set price of $377,844.00 While Mr. and Mrs. Vogt testified that the contract was for a fixed price amount, this is not enough to set aside the trial court's findings. The trial court found Appellees' evidence more convincing, and we must defer to the trial judge's ability to weigh the evidence and judge the credibility of the witnesses. We find no error on the breach of contract issue.

Vogt's second argument on appeal is that Appellees made fraudulent misrepresentations to it. Vogt claims that Hamhed committed fraud by only passing on 26% of the increase in pricing, as opposed to the full 258%.

> In a Kentucky action for fraud, the party claiming harm must establish six elements of fraud by clear and convincing evidence as follows: a) material representation b) which is false c) known to be false or made recklessly d) made with inducement to be acted upon e) acted in reliance thereon and f) causing injury.

*United Parcel Service Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999) (citation omitted).

> To prevail on a claim of fraud by omission, or fraud based on failure to disclose a material fact, a plaintiff must prove: a) that the defendants had a duty to disclose that fact; b) that defendants failed to disclose that fact; c) that the defendants' failure to disclose the material fact induced the plaintiff to act; and (d) that the plaintiff suffered actual damages. A duty to disclose facts is created only where a confidential or fiduciary relationship between the parties exists, or when a statute imposes such a duty, or when a defendant has partially disclosed material facts to the plaintiff but created the impression of full disclosure.

*Rivermont Inn, Inc. v. Bass Hotels & Resorts, Inc.*, 113 S.W.3d 636, 641 (Ky. App. 2003) (citations omitted).

Here, the trial court found no fraud. The court held that Hamhed obtained a price increase from the Army and passed a portion of that increase on to Vogt. The court also held that the increase in price was based on the contract between Hamhed and the Army and could not have been used to induce Vogt to perform under the subcontract. We agree with the trial court. The increase in price was based on the contract the Army had with Hamhed. Hamhed was under no obligation to pass any of that increase on to Vogt or inform Vogt of the full amount of the increase. Furthermore, Vogt was paid an additional 26% per piece of

laundry and did not know about the 258% increase; therefore, there was no false statement or misrepresentation.

Vogt's third argument on appeal is that Hamhed violated the implied covenant of good faith. "The implied covenant of good faith and fair dealing simply 'impose[s] on the parties . . . a duty to do everything necessary to carry' out the contract." *Harvest Homebuilders LLC v. Commonwealth Bank And Tr. Co.*, 310 S.W.3d 218, 220 (Ky. App. 2010) (citation omitted). Vogt argues that by not paying it the full $377,844.00, Hamhed breached this covenant. Vogt does not cite to where this issue was raised before the trial court, and our review of the record could find no mention of this issue; therefore, it is waived. "The Court of Appeals is without authority to review issues not raised in or decided by the trial court." *Regional Jail Authority v. Tackett*, 770 S.W.2d 225, 228 (Ky. 1989); *see also Shelton v. Commonwealth*, 928 S.W.2d 817, 818 (Ky. App. 1996). "[E]rrors to be considered for appellate review must be precisely preserved and identified in the lower court." *Skaggs v. Assad, by and through Assad*, 712 S.W.2d 947, 950 (Ky. 1986) (citation omitted).

Vogt's fourth argument concerns a motion for a mistrial it filed after the first two days of trial and after Vogt retained new counsel. The motion requested a mistrial because Vogt's first trial counsel erroneously waived its right to a jury trial, a witness was not allowed to testify, and the trial court allowed

evidence of settlement negotiations to be introduced during trial. The court ultimately denied the motion for a mistrial. We will address each issue.

First, as to the waiver of a jury trial, Vogt did not request a jury trial in this case until after the first two days of testimony and after retaining new counsel. All of the defendants, however, requested a jury trial. Eventually, the defendants waived their rights to a jury trial and agreed to a bench trial. What we must decide is did the trial court err in not allowing Vogt to have a jury hear the final two days of testimony in this case and does the lack of a jury require a mistrial.

"A mistrial is appropriate only where the record reveals 'a manifest necessity for such an action or an urgent or real necessity.'. . . A trial court has discretion in deciding whether to declare a mistrial, and its decision should not be disturbed absent an abuse of discretion." *Clay v. Commonwealth*, 867 S.W.2d 200, 204 (Ky. App. 1993) (citations omitted).

> It is universally agreed that a mistrial is an extreme remedy and should be resorted to only when there is a fundamental defect in the proceedings which will result in a manifest injustice. The occurrence complained of must be of such character and magnitude that a litigant will be denied a fair and impartial trial and the prejudicial effect can be removed in no other way.

*Gould v. Charlton Co., Inc.*, 929 S.W.2d 734, 738 (Ky. 1996) (citations omitted).

> Any party may demand a trial by jury of any issue triable of right by a jury by serving upon the other parties a demand therefor in writing at any time after the commencement of the action and not later than 10 days

after the service of the last pleading directed to such issue. Such demand may be indorsed upon a pleading of the party, and if indorsed on the complaint, the filing of the complaint shall constitute service of the demand.

Kentucky Rule of Civil Procedure (CR) 38.02.

The failure of a party to serve a demand as required by this rule and to file it as required by Rule 5.05 constitutes a waiver by him of trial by jury. A demand for trial by jury made as herein provided may not be withdrawn without the consent of the parties.

CR 38.04.

We believe Vogt waived its right to a jury trial. Vogt had multiple opportunities to request a jury trial, but it failed to do so. Vogt filed its original complaint on June 17, 2015. It then filed an amended complaint on September 26, 2016. Neither complaint requested a jury trial. Vogt's first request for a jury trial was in December of 2018, which was after the trial had already begun. This was an untimely request. Furthermore, when the defendants agreed to withdraw their jury trial demand and proceed with a bench trial, counsel for Vogt did not object or request a jury trial.

When trial by jury has been demanded as provided in Rule 38, the action shall be designated upon the docket as a jury action. The trial of all issues so demanded shall be by jury, unless (a) the parties or their attorneys of record, by written stipulation filed with the court or by an oral stipulation made in open court and entered in the record, consent to trial by the court sitting without a jury, or (b) the court upon motion or of its own initiative finds that a

-11-

right of trial by jury of some or all of the issues does not exist under the Constitution or Statutes of Kentucky.

CR 39.01. It is clear that Vogt waived its right to a jury trial, and a mistrial was not warranted.

Next, we move to the stricken witness. At the start of the trial, Appellees requested a separation of the witnesses, and the trial court complied. During the testimony of the first witness, one of Vogt's witnesses, Sylvia Cureton, entered the courtroom and heard the testimony. After the first witness was excused, Appellees brought Ms. Cureton's presence to the court's attention and moved to have her excluded from testifying. The trial court granted the motion. Vogt later moved for a mistrial and argued that the trial court erred by excluding the witness. As previously stated, court denied that motion.

> At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses and it may make the order on its own motion. This rule does not authorize exclusion of:
>
> (1) A party who is a natural person;
>
> (2) An officer or employee of a party which is not a natural person designated as its representative by its attorney; or
>
> (3) A person whose presence is shown by a party to be essential to the presentation of the party's cause.

Kentucky Rule of Evidence (KRE) 615.

We find no error here.

> If the rule is invoked, exclusion of witnesses from the courtroom is mandatory at trial in the absence of one of the enumerated exceptions in exclusion of witnesses rule. The rationale behind the rule is the recognition that a witness who has heard the testimony of previous witnesses may be inclined, consciously or subconsciously, to tailor his testimony so that it conforms to the testimony given by other witnesses.

*McGuire v. Commonwealth*, 368 S.W.3d 100, 112-13 (Ky. 2012) (citations omitted). Furthermore, without requesting to put on avowal evidence as to what Ms. Cureton's testimony would have been, KRE 103(a)(2), we cannot say whether the exclusion of her testimony was overly prejudicial to Vogt as to require a mistrial. Vogt was not entitled to a mistrial due to Ms. Cureton being excluded from testifying.

Finally, we will address the evidence of settlement negotiations. During trial, Hamhed moved to introduce text messages, dated October 23, 2014, between Mr. Hedrick and Ms. Vogt. Those messages were a discussion regarding a payment from Hamhed to Vogt. Hamhed was requesting a final invoice from the Army clothing contract indicating the number of pieces laundered so that it could pay Vogt. Ms. Vogt declined to send it because she believed Vogt was owed more money than it had been paid and she wanted to speak with her lawyer first. Hamhed wanted to introduce these texts to show that it was not withholding payment, but needed an invoice before it could release any payment. Vogt objected to these texts being introduced and argued they were settlement

-13-

negotiations and inadmissible pursuant to KRE 408. The trial court overruled the objection and informed Vogt's counsel that it could redact anything counsel believed were settlement negotiations. Vogt's counsel did not redact anything from the text messages.

We find no error here. These texts messages do not resemble settlement negotiations. There was no offer of money or other consideration in an attempt to compromise a claim. Ms. Vogt simply wanted her lawyer to look over everything before moving forward. In addition, Vogt had the opportunity to redact the text messages, but it failed to do so. Failing to avail oneself of a remedy is a waiver of that issue. *See Commonwealth v. Steadman*, 411 S.W.3d 717, 724 (Ky. 2013) (stating that an issue can be waived through inaction). Vogt was not entitled to a mistrial based on any of the issues raised in its motion.

We will now move away from the mistrial issue and on to Vogt's fifth main argument on appeal. Vogt argues that the deposition testimony of Mr. Berry went missing during trial because it is no longer in the record; therefore, the trial court could not have reviewed it before rendering its decision. Vogt claims this lack of evidence caused the trial court to rule against it. We find no error.

At the time of trial, Mr. Berry was living in Florida. The parties agreed to let Mr. Berry testify via deposition instead of requiring him to travel to Kentucky. On the first day of trial, counsel for Vogt attempted to play the video

deposition for the court; however, there was a malfunction, and it would not play. The court indicated it would take the video and the written transcript of the deposition and review the testimony. On the second day of trial, the court indicated on the record that it had reviewed Mr. Berry's testimony. Vogt presents no evidence that the trial court did not actually review the testimony. Further, there is no evidence that the court did not consider Mr. Berry's testimony when rendering its decision. There is no error.

Vogt's sixth claim of error is that the trial court failed to find unjust enrichment, *quantum meruit*, or promissory estoppel. First, we do not believe the unjust enrichment or *quantum meruit* issues were properly preserved. While they were briefly mentioned in the complaint, there was no argument regarding them made to the trial court. In addition, these issues were not ruled upon by the trial court in its order finding for Appellees, and Vogt did not address these issues in its motion to alter, amend, or vacate. An issue not raised or ruled upon in the trial court cannot be examined by an appellate court. *Fischer v. Fischer*, 197 S.W.3d 98, 102 (Ky. 2006). Second, even if these issues were preserved, the trial court held that Vogt was paid all the money it was entitled to under the oral contract; therefore, these equitable remedies are not available. *See Vanhook Enterprises, Inc. v. Kay & Kay Contracting, LLC*, 543 S.W.3d 569, 573 (Ky. 2018) (*quantum meruit* is not applicable when there is a valid contract.); *Bolen v. Bolen*, 169

S.W.3d 59, 65 n.14 (Ky. App. 2005) (a court should not use equitable remedies when legal remedies are available.).

As for promissory estoppel, Vogt claimed Hamhed should be estopped from denying them full payment. The trial court held that Vogt could not meet the elements of promissory estoppel because the promise it relied upon was the oral contract and the oral contract was not breached.

Promissory estoppel is described as follows: "A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." *Meade Const. Co., Inc. v. Mansfield Commercial Elec., Inc.*, 579 S.W.2d 105, 106 (Ky. 1979) (citation and internal quotation marks omitted). We agree with the trial court as to this issue. The promise relied upon by Vogt was the oral contract. The trial court found that the oral contract was not breached, a conclusion that we affirmed; therefore, there is no detrimental reliance and promissory estoppel is not applicable.

Vogt's final argument on appeal is that the trial court erred in failing to find tortious interference of contract. Vogt claimed that Mr. Reed and Mr. Hedrick conspired to keep Vogt from purchasing the Wash House. This conspiracy allegedly involved Mr. Hedrick not paying out the full amount of the

contract, or at least delaying the final payment due, when the clothing contract ended. This then caused Vogt to be unable to complete the purchase of the Wash House and Mr. Reed to purchase it.

To prove tortious interference with a contract, Vogt has to show (1) the existence of a contract; (2) that Mr. Reed and Mr. Hedrick knew of the contract; (3) that Mr. Reed and Mr. Hedrick intended to cause a breach of that contract; (4) that Mr. Reed and Mr. Hedrick's actions did indeed cause a breach; (5) that damages resulted to Vogt; and (6) that Mr. Reed and Mr. Hedrick had no privilege or justification to excuse their conduct. *Snow Pallet, Inc. v. Monticello Banking Co.*, 367 S.W.3d 1, 5-6 (Ky. App. 2012). Here, the contract at issue was the contract between Vogt and Mr. Gonzalez for the purchase of the Wash House. The trial court held that Vogt did not prove that Mr. Reed and Mr. Hedrick knew about the contract to purchase the Wash House. The court found that the first Mr. Hedrick knew about the attempted purchase was after it had already fallen through. We agree with the trial court.

The evidence supports the trial court's finding that Mr. Hedrick did not know about the Wash House until after Vogt's purchase agreement with Mr. Gonzalez was terminated. Vogt was to make the final payment on the Wash House in September of 2014. By October of 2014, the final payment had not been made, and the purchase was terminated. In November of 2014, Mr. Reed contacted Mr.

Hedrick via text message and informed him that Vogt's attempt to purchase the Wash House had fallen through. Mr. Hedrick's response indicated he was unaware Vogt tried to purchase the Wash House. Further supporting the trial court's conclusion is the evidence in the record showing Hamhed was trying to give Vogt a payment in October of 2014, but Vogt would not send an invoice in order to receive said payment. If Hamhed was trying to pay Vogt in October, then it cannot be said that Mr. Hedrick was delaying payments to cause the Wash House purchase to fall through. Finally, it is worth noting that Mr. Reed and Mr. Hedrick both consistently testified that they did not know about Vogt's attempt to purchase the Wash House until after the deal was terminated.

## CONCLUSION

Based on the foregoing, we affirm the judgment of the trial court.


ALL CONCUR.

BRIEFS FOR APPELLANT:

Myrle L. Davis
Louisville, Kentucky

BRIEF FOR APPELLEES HAMHED,
LLC AND ERIC HEDRICK:

Van T. Willis
Crystal G. Rowe
Alyssa C.B. Cochran
New Albany, Indiana

BRIEF FOR APPELLEES VERITAS
ENTERPRISES, LLC D/B/A CAFÉ
LAUNDRY AND MICAH REED:

J. Bart McMahon
Louisville, Kentucky